# STATE *v.* LOUIS H. NORMAN.

1. *Constitutional Law—Statute Law—Adultery.*

    Section 3, chap. 7, Sess. Laws 1892, being a part of the act of the legislature of the territory of Utah approved February 4, 1892, respecting polygamy, adultery, and other offenses, is not in conflict with any act of congress, and was a valid law of the territory when enacted; and by virtue of section 2, art. 24, of the state constitution, the law was continued in force under the state government until altered or repealed by the legislature. Under the provisions of section 3 of that act, adultery became a crime against the laws of the state.

2. *Adultery—Exclusive Legislation—Statutory Construction.*

    The acts of congress defining " adultery," and prescribing punishment therefor, in the territories, as a crime against the United States, were not exclusive of territorial legislation on the same subject, and did not prevent the territorial legislature from punishing by statute the same act as an offense against the territorial government and its laws.

3. *Organic Act—Territorial Legislative Power.*

    Under section 6 of the organic act of the territory of Utah, the power of the legislature to legislate extended to all rightful subjects of legislation, consistent with the constitution of the United States and the provisions of that act, but all territorial enactments were subject to disappraval by congress; and the act of 1892 was a valid exercise of legislative power.

4. *Same Act an Offense against each of Two Governments—Punishment for.*

    Where a person perpetrates an act which constitutes a crime against the United States, and also an offense against a territory or state and its local laws, he is subject to punishment by each government, and neither of such punishments is in contravention of the constitutional inhibition against the twice putting in jeopardy for the same offense.

5. *Constitutional Construction.*

    The specific reference in section 2, art. 24, of the constitution,

continuing in force that part of the act of 1892 respecting polygamy, does not exclude from the operation of that section of the constitution the part of the act which refers to adultery.

6. *Same—Special Reason.*

Where it is manifest that at the time of the framing of the constitution, and the drafting of a certain provision thereof, there existed some special reason why one thing should be mentioned in such provision, and no such reason existed as to another, a reference to the former does not, as a general rule, exclude the latter; and, when such reason exists, the maxim, "*Expressio unius est exclusio alterius,*" has no application.

7. *Same — Constitutional Convention — Proceedings of — Judicial Notice.*

In construing a provision of the constitution, the court may, to ascertain the true meaning and purpose of the provision, take judicial notice of the proceedings of the convention which framed the constitution.

8  *Same –Prisoner—Examination—Waiver.*

Under section 13, art. 1, Const., and section 4509, Rev. St., a prisoner has the right, with the consent of the state, to waive examination before the committing magistrate; and if none was had, and, when called upon to plead, he fails to interpose the objection that he has not been lawfully committed, or waived an examination, but goes to trial without objection, the examination will be presumed to have been waived, and after trial he will be precluded from insisting on the objection.

ZANE, C. J., dissenting.

(No. 855.   Decided April 4, 1898.)

Appeal from the First district court, Cache county. C. H. Hart, *Judge.*

Louis H. Norman was convicted of adultery, and appeals. *Affirmed.*

*Moyle, Zane & Costigan,* for appellant.

·  *A. C. Bishop, Atty. Gen.,* and *Benner X. Smith, Asst. Atty. Gen.,* for the state.

BARTCH, J.:

The defendant was prosecuted for and convicted of the crime of adultery. Upon being sentenced to the penitentiary for one year, he appealed to this court.

Counsel for the appellant contend that, at the time the act was charged to have been committed, there was no law in force in this state which made adultery a public offense. They argue that the act of the territorial legislature respecting polygamy, adultery, and other kindred offenses, approved February 4, 1892 (Sess. Laws 1892, p. 5) was never a valid law of the territory of Utah, and, except as to polygamy, never became effective in the state by any provision of the constitution, and that the law of congress which provided for the punishment of adultery as a crime ceased to have force in Utah upon the transition of the territorial to the state form of government.

The provision of the act of 1892, respecting the crime of adultery, is found in section 3, which reads: "That whoever commits adultery shall be punished by imprisonment in the penitentiary not exceeding three years; and when the act is committed between a married woman and a man who is unmarried, both parties to such act shall be deemed guilty of adultery; and when such act is committed between a married man and a woman who is unmarried, the man shall be deemed guilty of adultery." This provision prescribes the punishment for, and defines the acts which constitute adultery, and is the same as section 3 of the act of congress of March 3, 1887, known as the "Edmunds-Tucker Law." The territorial act contains other provisions concerning polygamy, bigamy, and other offenses which are similar to provisions contained in the "Edmunds-Tucker Law," and in the act of congress approved March 22, 1882, known as the "Edmunds Law," but none of the provisions of the act of 1892 appear to be

repugnant to any provision contained in either of the acts of congress.

It is insisted, however, for the appellant, that the acts of congress fully covered the whole subject, and deprived the legislature of the power to legislate concerning the same, and that, therefore, the act of 1892 was absolutely void. It is true the territory of Utah was a mere dependency of the United States, but as organized by congress its governmental functions were almost as extensive as those of a state. Like a state, it had an executive, a legislative, and a judicial department, and, unless disapproved by congress, the enactments of the legislature were as binding upon the people of the territory as the statutes of a state are upon its people. A person who violated the statutes of the territory could be apprehended and punished the same as one who violated the laws of a state. Although a mere dependency, and not a sovereignty like a state, the territory had, subject, of course, to the constitution of the United States and laws of congress applicable to it, all the governmental power necessary to constitute, in all respects, an adequate and complete government for its people. True, its supreme power was lodged in congress, and congress could legislate directly for the territory. The laws of congress enacted for it constituted its fundamental law, the same as the contitution constitutes the fundamental law of the state. It follows that, where the laws of congress upon any subject were exclusive, the legislature of the territory had no power to legislate, and so, where the power vested by the constitution of the United States in congress to legislate upon a subject is exclusive, the legislature of a State cannot legislate. Both governments are subject to the constitution of the United States. Exclusiveness, therefore, is the test which, in each government, determines

the right of the legislature to legislate as to any subject upon which the power to legislate is vested in congress, for neither a state nor territorial legislature has a right to enact laws respecting a subject concerning which the power to legislate is exclusively vested in congress, whether it be so vested by express provision of the constitution or by necessary intendment. The doctrine on this subject was stated by Mr. Chief Justice Marshall in *Sturges* v. *Crowninshield,* 4 Wheat. 122, 193, thus; "Whenever the terms in which a power is granted to congress, or the nature of the power, require that it should be exercised exclusively by congress, the subject is as completely taken from the state legislature as if they had been expressly forbidden to act on it." The true object to be attained, then, and the nature of the power, are to be considered in determining its exclusiveness, and evidently the controlling principles are the same, whether it be attempted to declare an enactment of a state void, because of an exclusive power in congress to legislate upon the subject, by reason of a provision of the constitution of the United States, or to declare an enactment of a territory void because of the exclusiveness of the legislation of congress on the subject for the territory.

The organic act under which the government of the territory of Utah was constituted, provided, in section 6 thereof, as follows: "That the legislative power of said territory shall extend to all rightful subjects of legislation, consistent with the constitution of the United States and the provisions of this act; but no law shall be passed interfering with the primary disposal of the soil; no tax shall be imposed upon the property of the United States; nor shall the lands or other property of nonresidents be taxed higher than the lands or other property of residents. All the laws passed by the legislative as-

sembly and governor shall be submitted to the congress of the United States, and if disapproved shall be null and of no effect."

· Under the first clause, the territorial legislature had power to legislate as to "all rightful subjects of legislation" consistent with the constitution of the United States and with that act. Then follow restraining provisions as to legislation concerning certain subjects, and a provision whereby any enactment of the legislature might be disapproved by congress, and thereby rendered void and of no effect. It will be noticed there is no restraint whatever imposed in this section as to legislation respecting crimes. While it is true that any enactment of the legislature was susceptible of being disapproved by congress and rendered invalid, the converse is equally true that if an enactment was not so disapproved it was valid, unless in conflict with the constitution of the United States, or unless the legislation of congress on the same subject was exclusive, or the territorial law was in conflict therewith.

In Clinton v. Englebrecht, 13 Wall. 434, 446, where the principal controversy was concerning a territorial statute, it was observed: "The law has received the implied sanction of congress. It was adopted in 1859. It has been upon the statute book for more than twelve years. It must have been submitted to congress soon after it was enacted, for it was the duty of the secretary of the territory to transmit to that body copies of all laws on or before the 1st of the next December in each year. Thus simple disapproval of congress at any time would have annulled it. It is no unreasonable inference, therefore, that it was approved by that body." The power which thus could be exercised by the territorial legislature was

nearly as extensive as that exercised by any state legislature. *Hornbuckle* v. *Toombs*, 18 Wall. 648.

Nor are we able to find any provision in the organic act, or in any of the laws of congress applicable to the territory of Utah, which in any wise operated to restrain the legislature from enacting laws respecting polygamy, adultery, or other kindred offenses. The laws of congress were not enacted because the legislature had no power to legislate on these subjects. Nor was the nature of the power such as to prevent the legislature from exercising it. Acts and conduct which offend the moral sense and affect the welfare of the community constitute rightful subjects of legislation, and the legislature having had the fundamental authority to legislate on such subjects, and the acts of congress containing no limitation of such authority, nor any exclusive legislation on the subjects, the legislature had the right to enact the law of 1892, and therein define and punish adultery as a crime, even though the Edmunds-Tucker law, previously enacted by congress, provided for the punishment of such acts as offenses against the laws of the United States. The fact that an offender might thus possibly be subjected to a second punishment for the same act did not render the act of 1892 void. Each inhabitant of the territory of Utah was also an inhabitant of the United States, and was therefore a subject of each government, and owed allegiance to and was amenable to the laws of each. If, therefore, he perpetrated an act which constituted an offense against the United States, and also an offense against the territory and its local laws, we know of no legal principle which prevented him from becoming subject to punishment by each government, and neither of such punishments would be in contravention of the constitutional inhibition against the twice putting in jeopardy for the

same offense. That inhibition does not operate as to the act, but as to the offense, and an offense, in legal significance, is the transgression of a law. If, however, in any case, principles of justice dictate that both governments ought not to prosecute and punish the offender for the same act, the court may, and many of them do, manifest a disposition, in the absence of express legislative command, to accept the prosecution and punishment in one jurisdiction as a ground for relieving the wrongdoer from prosecution for the same act in the other, although the law is well settled that each government has the right to prosecute for such act.

In Bish. Cr. Law, § 178, the author says: "There are, we have seen, wrongful acts of a nature to violate duties both to the United States and a particular state, and some of these acts are declared crimes by the positive laws of each. It is probably the doctrine of the courts, though not free from doubt in principle, that, whenever congress has the constitutional power to render a thing punishable as a crime against the United States, she can make this legislation exclusive of state law. But, however this may be, if the national statute neither in terms nor by necessary implication excludes the state law, the latter is not superseded. Congress doubtless had the power to make its legislation exclusive of territorial law, because in the organic act it expressly reserved the power to disapprove all legislative enactments, and the fact that it failed to disapprove the act of 1892 should receive due consideration in determining the validity of that law. The other legal propositions stated by the author are the same, whether one of the offended governments be a state or a territory, and the doctrine hereinbefore mentioned has frequently been recognized in cases of counterfeiting and other crimes. The law on this subject is clearly stated

by Mr. Justice Grier in *Moore* v. *People*, 14 How. 13, as follows: "Every citizen of the United States is also a citizen of a state or territory. He may be said to owe allegiance to two sovereigns, and may be liable to punishment for an infraction of the laws of either. The same act may be an offense or transgression of the laws of both. Thus, an assault upon the marshal of the United States, and hindering him in the execution of legal process, is a high offense against the United States, for which the perpetrator is liable to punishment; and the same act may also be a gross breach of the peace of the state, a riot, assault, or a murder, and subject the same person to punishment, under the state laws, for a misdemeanor or felony. That either or both may (if they see fit) punish such an offender cannot be doubted. Yet it cannot be truly averred that the offender has been twice punished for the same offense, but only that by one act he has committed two offenses, for each of which he is justly punishable. He could not plead the punishment by one in bar to a conviction by the other. Consequently this court has decided in the case of *Fox* v. *State*, 5 How. 432, that a state may punish the offense of uttering or passing false coin as a cheat or fraud practiced on its citizens; and in the case of *U. S.* v. *Marigold*, 9 How. 560, that congress, in the proper exercise of its authority, may punish the same act as an offense against the United States."

In the case of *In re* Murphy, 40 Pac. 398, the validity of section 74, c. 73, Sess. Laws 1890, Wyo. T., an enactment respecting bigamy was assailed on the ground that at the time of its enactment there existed a law of congress punishing bigamy in all the territories. That case is very like the one at bar. The supreme court held the territorial statute valid, and, in the course of the opinion, Mr. Justice Potter, said: "The crime of bigamy, as defined

16 UTAH—30

and punishable by act of congress, is a crime against the sovereignty of the United States. The act of congress embraces no express limitation upon the right of the territory also to punish the same act as an offense against it and its local laws, nor upon the local legislature to enact a law defining and providing a punishment therefor as an offense against the territorial sovereignty. As there are, in practical and legal effect, two governments, although the one emanates from the other, we are unable to perceive why the legislature of the territory, under the general grant of power with which it was invested, may not have enacted a valid law assuming to punish as a territorial offense the crime of bigamy. It does not conflict with the United States statute. It could not and did not assume to destroy the force or effect of the congressional provision." Bish. Cr. Law, §§ 179, 987, 989; Cooley Const. Lim. p. 37, note 1; *Fox* v. *State*, 5 How. 410; *Miners' Bank* v. *State*, 12 How. 1; *Territory* v. *Guyott*, 9 Mont. 46; *Harlan* v. *People* (Mich.) 1 Doug. 207; *Knudsen* v. *Hannberg*, 8 Utah 203; *Cope* v. *Cope*, 137 U. S. 682.

In support of their position, counsel for the appellant cite the case of *Prigg* v. *Com.*, 16 Pet. 540. That case was commented upon in the case of *Moore* v. *People*, *supra*, and the questions decided were clearly pointed out. An examination will show that they were entirely different from the questions presented in this case. Nor do we think that Mr. Justice Field, in *Davis* v. *Beason*, 133 U. S. 333, by the use of the expression, "The cases in which the legislation of congress will supersede the legislation of a state or territory, without specific provisions to that effect, are those in which the same matter is the subject of legislation by both," intended to establish a doctrine that would abrogate a territorial statute like the one in question herein. Nor de we think such an intention manifest from

the whole opinion, for in a preceding portion thereof (the statute under consideration being a law of the territory of Idaho respecting bigamists, etc.), and after quoting from the act of congress referring to the same subject, he observes: "This is a general law applicable to all territories and other places under the exclusive jurisdiction of the United States. It does not purport to restrict the legislation of the territories over kindred offenses or over the means for their ascertainment and prevention." We are of the opinion that the act of 1892, concerning adultery and other crimes, and prescribing the punishments for the same, was a valid exercise of legislative power, and that the statute is not in conflict with the laws of congress.

The remaining question to be determined, on this branch of the case, is, was section 3 of the act of 1892 continued in force in the state by the constitution? The determination of this question depends upon the effect and operation of section 2, art. 24, Const., which reads: "All laws of the territory of Utah now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations or are altered or repealed by the legislature. The act of the governor and legislative assembly of the territory of Utah entitled 'An act to punish polygamy and other kindred offenses,' approved February 4, A. D. 1892, in so far as the same defines and imposes penalties for polygamy, is hereby declared to be in force in the state of Utah."

The first clause is a general provision under which all territorial statutes, which were valid and effective at the time of the taking effect of the constitution, were continued in force under the state government, until they expired by their own limitations, or where changed or abrogated by the legislature; but, as to the act of 1892, coun-

sel for the appellant insist that the reference to a specific part of that act, and declaring such part to be in force in the state, excludes all other parts of the same act, and urge the application of the maxium, *"Expressio unius est exclusio alterius."* Because, however, a certain portion of the act was continued in force by express provision of the constitution, it does not necessarily follow, as a sequence, that all other portions of the same act were thereby withdrawn from the effect and operation of the general clause contained in the same section of that instrument, nor that the maxim stated is applicable to the case. What the effect of the specific reference is upon the other provisions of the act depends upon the intention with which and the purpose for which such reference was made by the framers of the constitution. Such intention and purpose must control. Where it is manifest that at the time of the framing of the constitution, and the drafting of a certain provision thereof, there existed some special reason why one thing should be mentioned in such provision, and no such reason existed as to another, a reference to the former does not, as a general rule, exclude the latter, and the existence of such reason will tend to show the intent and purpose of the provision and reference.

Did, then, any special reason exist, when the constitution was framed, for declaring that the act of 1892, in so far as it related to polygamy, should be in force in the state, without mentioning adultery or other offenses, punishment for which was provided for in the same act? That such reason existed, we think, is clearly apparent from the enabling act, as well as from the proceedings of the convention, of which proceedings we have a right to take judicial notice. The enabling act was passed preliminary to the formation of the state government, and

the terms and conditions upon which the territory could be admitted into the Union as a state were therein set forth. The substantial compliance with the terms and conditions imposed was a prerequisite to the issuance of the proclamation of admission by the president of the United States, and we must assume that the framers of the constitution were aware, not only of all those terms and conditions, but also of the fact that a noncompliance therewith would defeat the very object of the convention, and render the taking effect of the instrument which they were framing impossible. It is natural, under such circumstances, for men to proceed with caution. In the enabling act it was required that the convention should provide by ordinance, irrevocable without the consent of the United States and the people of the state, "that perfect toleration of religious sentiment shall be secured, and that no inhabitant of said state shall ever be molested on account of his or her mode of religious worship; provided, that polygamous or plural marriages are forever prohibited." Section 3. Here was a provision imposing a condition as to polygamy, for which it was necessary to provide in the constitution, but nowhere in the enabling act does there appear to be any such provision as to adultery or other kindred offenses defined in the act of 1892. Turning, now, to the constitution (article 3), we find a provision respecting polygamy in substantially the language above quoted from the enabling act. In the proceedings of the convention it is shown that considerable discussion took place respecting its sufficiency to comply with the requirements of the act. Some of the members maintained that the act of 1892 was not a valid enactment, and therefore would not be effective by virtue of the general provision of section 2, art. 24, Const., after the admission of the territory as a state; and that the

clause in article 3, not being self-executing, and the laws of congress respecting polygamy ceasing to have force or effect upon the advent of statehood, there would be no punishment provided for a violation of the provision in article 3, and consequently no means of enforcing the same. Other members maintained the contrary view, and the discussion shows no little anxiety lest the failure to comply strictly with the provisions of the enabling act might frustrate the objects of the convention. The discussion culminated, as appears, in the adoption of the reference to the act of 1892, contained in section 2, art. 24, Const., as an amendment to that section as originally drafted. Thus it seems this reference found its way into the constitution out of abundant precaution to meet the requirements of the enabling act. While, in general, those proceedings are less conclusive in determining the proper construction of a provision of the constitution than are legislative proceedings in determining the construction of a statute, still where, as here, the inquiry is designed to ascertain the purpose sought to be accomplished by a particular provision, an examination of the proceedings of the convention which framed the instrument is proper, and if, as appears in this case, the proceedings clearly show the purpose, their aid in interpretation is valuable. Cooley, Const. Lim. 80-83.

Considering, then, with reference to polygamy, the terms and conditions imposed by the enabling act, the provisions of the constitution applicable, and the proceedings of the convention which framed that instrument, it is clear that a special reason existed for the adoption of the provision specially declaring that part of the act of 1892, defining polygamy and prescribing penalties therefor, to be in force in the state. A strict compliance with the terms of the conditions of the enabling act was the

reason, and this is indicative that the intention and purpose of the convention which adopted that provision of section 2, art. 24, of the constitution, was to comply with the letter and spirit of that act, and not to eliminate from the statutes the law which denounced adultery and other kindred offenses, and prescribed penalties for a violation thereof; and, in view of the circumstances of this case, we may assume that the people who ratified that provision did so with the same intent and purpose. Such being the case, the act of 1892 remained in force by virtue of the general provision of section 2, art. 24, Const., until altered or repealed by the legislature, and the maxim, "*Expressio unius est exclusio alterius,*" has no application.

While the special mention of one thing in an enactment weakens the force of the general law, such mention of one thing does not always exclude every other. As a general rule in interpretation, where there is a particular reason or a necessity for mentioning one thing and none for mentioning another, the expression of the former will not exclude the latter. Endl. Interp. St. §§ 397-399; *Brown* v. *Buzan*, 24 Ind. 194. And nothing in construction of statutes is better settled than that repeals, and likewise annulments by implication, are not favored by the courts. *Cope* v. *Cope, supra*

It is also insisted for the appellant that his motion in arrest of judgment ought to have been granted on the ground, as stated in the motion, that the record fails to show that the defendant was lawfully bound over or committed by the magistrate named in the information. The information, in the form of the statute, stated that the defendant was bound over to answer the charge by the committing magistrate, and it is claimed that it was incumbent upon the prosecution to offer proof in support of this allegation. In the absence of any insistence, at or

before trial, that the defendant was not lawfully committed, we think such proof was not necessary. Under the constitution and laws of this state, a prisoner has the right, with the consent of the state, to waive examination before the committing magistrate. Section 13, art. 1, Const.; Sess. Laws 1896, c. 23, p. 98; Rev. St. § 4509. Therefore, where a prisoner, when called upon to plead, interposes no objection that he has not been lawfully committed or waived an examination before the committing magistrate, and goes to trial without objection, the examination will be presumed to have been waived. This court so held in *State* v. *Spencer*, 15 Utah 149, where the same question was raised.

The appellant further contends that the verdict is not justified by the evidence, claiming that he was convicted on the uncorroborated evidence of the prosecuting witness. An examination of the testimony shows clearly that this contention is not well founded and is unwarranted. Without referring to it in detail, there is an abundance of corroborating proof in the record which tends to connect the defendant with the crime, and support the judgment. A discussion of the other questions presented is not deemed necessary, although they have received due consideration. We find no reversible error in the record. The judgment is affirmed.

MINER, J., concurs.

ZANE, C. J. (dissenting):

Undoubtedly congress may legislate for a territory directly; or it may direct the territorial legislature to do so; or, having given such authority, it may still exercise it, and therefore withdraw the authority so conferred on the territory. The latter possesses such power, at the pleasure of congress. In 1850 congress conferred on the

territorial legislature of Utah the power, in general terms, to punish various crimes, including adultery and fornication; but, the latter body having failed to pass a law prohibiting and punishing adultery and fornication, congress in 1887, elected to enact a law for the territories, specifically defining and puishing those offenses. It decided to exercise the power itself, and no longer rely upon the territory to execute it. The agent, having failed to exercise the power, the principal determined to make the law and to withdraw the authority of the agent to do so. While the law of congress remained in force, the territory could not make one prohibiting and punishing the same offense. But, five years after the United States law went into effect, the territory, in the same terms, attempted to enact the law in question.

The opinion of the court declares, in effect, that congress passed the law prohibiting and punishing adultery because the territories had failed to do so; that is to say, congress passed a law punishing adultery in the territory because the territory refused to do so. The power of the agent to do an act ceases when the principal does the act himself; so the power of the territory to pass the law punishing adultery ceased when the United States passed the law for itself. The act of congress in question was made for the same territory and to protect the same people from the evil effects of adultery and fornication that the territorial law covered. The former could have no force in the states. It had a local application, and was not intended to protect society in the various states. Those states, under the constitution of the United States, had the exclusive power to do so. The congressional enactment, so far as it applied to adultery and fornication, was not intended for the people of the United States outside of the territories and other

places where the United States has exclusive jurisdiction. It is true that authority may be found to the effect that cities may by ordinance prohibit and punish misdemeanors, while a state law doing the same thing remains in force, but in that case the state law is general throughout the jurisdiction of the state. It is not local, and is for the people of the state and for their protection. Not so as to the act of congress in question. It has no application in the states. When Utah ceased to exist as a territory and became a state, the act of congress, so far as it applied to the offense of adultery or fornication, ceased to have any effect. It was made for the territory, and went out with it so far as it applied to Utah. The people of the United States have not delegated to congress the power to pass general laws for their protection against fornication and adultery in the states. The source of that power is in the people of the state through their legislatures.   Besides, the state legislature does not make special ordinances for the people of a particular city, as congress makes special laws for the people of the territories or a particular territory. The analogy between a state law and the ordinance of a city, and the law of the United States for the territories and the law of the territorial legislature, does not hold good. The purposes of the former state law and the city ordinances are regarded as different, while there is but one purpose of the law of congress for the territory and the territorial law. The ordinance is to protect the people of the city, while the state law is to protect the people of the state. The law of the territorial legislature is to protect the people of the entire territory, while the law of congress for the territory is for the protection of the same people, —the injury resulting from the act is to precisely the same people.

It is also said that the state may pass a law defining

counterfeiting as a crime, and punishing it, and the United States may pass a similar law. In that case the state law is for the protection of its people, and not for the people of the United States. The source and purpose of such laws differ. One proceeds from state sovereignty; the other from the sovereign power of the United States. The one law is for the protection of the people of the state; the other is for the protection of the people of the United States. One is to punish the wrong to the state; the other the wrong to the United States. They do not exercise the same power as congress and the territory do in legislating for the territory. The congressional law and the territorial law in this case proceed from the same source,—from the United States,—and are for the same territory and the same people. It is the same power, exercised in the one case by congress, and in the other by the territory.

It would appear strange, indeed, if the territorial legislature, the instrumentality of congress, could exercise the same power, in punishing the same offense against the same people, after congress had itself exercised it, and punished the same offense against the same people. In that case, the act of the territorial legislature is vain and of no effect. In the case of *Davis* v. *Beason*, 133 U. S. 333, the United States supreme court laid down the law as follows: "The cases in which the legislation of congress will supersede the legislation of a state or territory, without specific provisions to that effect, are those in which the same matter is the subject of legislation by both. There the act of congress may well be considered as covering the entire ground." The territorial law in question was not continued in force by section 2, art. 24, of the state constitution. That section, by its terms, continued in force only valid laws of the territory. For the reasons stated above, I dissent from the judgment of the court.