**PEOPLE OF PUERTO RICO v. SHELL CO. (P. R.), LIMITED, et al.**

**No. 3168.**

Circuit Court of Appeals, First Circuit.

Nov. 20, 1936.

William C. Rigby, of Washington, D. C. (B. Fernandez Garcia, Atty. Gen., of Puerto Rico, and Nathan R. Margold, of Washington, D. C., on the brief), for the People.

William D. Whitney, of New York City (Jaime Sifre, Jr., of San Juan, P. R., and Hugh A. Fulton and Cravath, de Gersdorff, Swaine & Wood, all of New York City, on the brief), for appellee Shell Co. (P. R.) Limited.

James R. Beverley, of San Juan, P. R. (Jose Lopez Baralt and Ryder Patten, both of San Juan, P. R., on the brief), for appellees Texas Co. (P. R.), Inc., and others.

Oscar B. Frazer, of New York City (Hartzell, Kelley & Hartzell, of San Juan, P. R., on the brief), for appellees Pyramid Products, Inc., and Ernest Yates, and others.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

BINGHAM, Circuit Judge.

This is an appeal from a judgment of the Supreme Court of Puerto Rico of December 20, 1935, dismissing an appeal from a judgment of the District Court of San Juan, where the cause was dismissed for want of jurisdiction.

It appears that on May 28, 1934, the prosecuting attorney for the District of San Juan filed in the court for that District an information against certain named corporations engaged in the distribution and sale of gasoline and other by-products of petroleum in the Municipality of San Juan; against certain individuals, as officers, managers, agents, and employees of said corporations; and against certain other individuals engaged in the distribution and sale of gasoline at retail in connection with the business of the corporations and their several agents, managers, and employees.

The information charged that the defendants had entered into a conspiracy to restrain competition and to fix prices for the sale and distribution of gasoline at wholesale and at retail in the Municipality of San Juan.

The defendants demurred to the information on the ground, among others, that the court was without jurisdiction to entertain the prosecution because the Act of March 14, 1907, on which the prosecution was based, was null and void and not in

force; that the Legislature of Puerto Rico was without authority to enact the legislation as Congress had sole jurisdiction over the matter to which it related and had legislated thereon. In the District Court the demurrer was sustained and the information dismissed on the ground that the Puerto Rican Act of March 14, 1907, was without legal effect, as the Sherman Act (15 U.S.C.A. §§ 1–7, 15 note), as supplemented and added to in 1914 by the Clayton Act (15 U.S.C.A. §§ 12–27) covered the whole ground of the local statute. And the Supreme Court, following its earlier decision in United Theatres, Inc., v. District Court of San Juan, 47 P.R.R. 725, dismissed the appeal, thereby affirming the decision of the court below.

The Act of Puerto Rico of March 14, 1907,[1] is substantially the same as the Act of Congress known as the Sherman Anti-Trust Act of July 2, 1890, 26 Stat. 209, c. 647 (15 U.S.C.A. §§ 1–7, 15 note). The opening words of the act of 1907—"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade, commerce,"—are identical with the opening words of section 3 of the Sherman Act (15 U.S.C.A. § 3). After the word "commerce" in this sentence of section 1 of the Act of 1907, the Legislature of Puerto Rico inserted the words "business transactions, and lawful and free competition in a town, or among the several towns of Porto Rico," which words are not found in the Sherman Act; although in section 3 of the latter act the word "commerce" is followed by the phrase "in any Territory of the United States or of [in] the District of Columbia. * * *"

The words "business transactions, and lawful and free competition" used in section 1 of the Act of 1907, do not enlarge the meaning of the word "trade" found in section 3 of the Sherman Act (15 U.S.C.A.

---

[1] "An Act to Protect Trade and Commerce against Unlawful Restraints and Monopolies.

"(Approved March 14, 1907)

"Section 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade, commerce, business transactions, and lawful and free competition in a town, or among the several towns of Porto Rico is hereby declared to be illegal. Every person who shall make any such contract or engage in any such conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both such punishments in the discretion of the court.

"Section 2. Every person who shall monopolize or attempt to monopolize or combine or attempt to combine with any other person or persons to monopolize any part of the trade or commerce in any town of Porto Rico or between the towns thereof shall be deemed guilty of a misdemeanor and shall be punished by a fine not exceeding five thousand dollars, or by imprisonment, not exceeding one year, or by both such punishments, in the discretion of the court.

"Section 3. The district courts of the island are hereby vested with jurisdiction to prevent, prohibit, enjoin and punish violations of this law; and it shall be the duty of the attorneys of the district courts of the island to institute proceedings of injunction or any other civil proceeding to prevent, prohibit, enjoin, and restrain such violations. When the parties complained of shall have been duly notified, the court shall proceed, as soon as may be, to the hearing and determination of the case; and pending such proceedings and before final decree, the court may make such temporary restraining order or prohibition as shall be deemed just in the premises.

"Section 4. Whenever it shall appear to the court before which any proceeding under this Law may be pending, that the ends of justice require that other parties should be brought before the court, it may cause them to be summoned, whether they reside or not in the district in which the court is held and subpœnas to that end may be served in any district by the marshal thereof.

"Section 5. Any person who shall be injured in his business or property by any other person, corporation, company or association, by reason of anything forbidden or declared to be unlawful by this Law, may sue therefor in the court for the district in which the defendant resides, or in the court for the district in which the plaintiff resides, and shall recover the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

"Section 6. The word 'person,' or 'persons,' wherever used in this Law, shall be deemed to include corporations, companies or associations authorized by the laws of Porto Rico, the laws of any State or Territory of the United States, or the laws of any foreign country.

"Section 7. This Law shall take effect on and after May 1, 1907."

§ 3), for the Supreme Court, in Atlantic Cleaners & Dyers, Inc., v. United States, 286 U.S. 427, 436, 52 S.Ct. 607, 610, 76 L. Ed. 1204, held that the word "trade" is not there "used in its most restrictive sense, and as equivalent to traffic in goods, or buying and selling in commerce or exchange," but in a broader sense "as equivalent to occupation, employment, or business, whether manual or mercantile." This being so, if the Sherman Act of 1890 had been extended to and was in force in the organized territories of the United States at the time this action was brought; or if the Sherman Act, as extended and added to by the Clayton Act of October 15, 1914, was so extended and in force, then the provisions of section 3 of the Sherman Act, as respects Puerto Rico, cover the entire ground and relate to the same subject-matter as is embraced in section 1 of the Puerto Rican Act of March 14, 1907.

It is conceded by both parties to this controversy that the provisions of the Sherman Act are applicable to Puerto Rico, an organized territory of the United States, though not incorporated in it, and therefore in force there; that its provisions were so extended by Congress in the enactment of section 14 of the Organic Act of April 12, 1900, 31 Stat. 80, c. 191 (48 U.S.C.A. § 734 and note) re-enacted word for word in section 9 of the Organic Act of March 2, 1917, 39 Stat. 951, 954, c. 145 (48 U.S.C.A. § 734). This section reads as follows:

"Sec. 14. That the statutory laws of the United States not locally inapplicable, except as hereinbefore or hereinafter otherwise provided, shall have the same force and effect in Porto Rico as in the United States, except the internal-revenue laws."

The provisions of the Sherman Act, as they have existed since February 12, 1913, are found in sections 1 to 11, inclusive, of chapter 1, title 15 U.S.C. and the provisions of that act, as extended and enlarged by the Clayton Act of October 15, 1914 (38 Stat. 730, c. 323) are found in sections 12 to 27 of chapter 1, title 15 U.S.C. (15 U.S.C.A. §§ 12–27). In section 1 of the Clayton Act, which is section 12, c. 1, title 15 U.S.C. (15 U.S.C.A. § 12), the word "commerce" as there used is defined as "trade or commerce among the several States and with foreign nations, or between the District of Columbia or any Territory of the United States and any State, Territory, or foreign nation, or between any insular possessions or other places under the jurisdiction of the United States, or between any such possession or place and any State or Territory of the United States or the District of Columbia or any foreign nation, or *within the District of Columbia or any Territory or any insular possession or other place under the jurisdiction of the United States:* Provided, That nothing in this Act [the aforesaid sections] contained shall apply to the Philippine Islands." (Italics supplied.)

In view of the foregoing, we think that Congress understood, at the time of its enactment of the Clayton Act, that the Sherman Act had previously been extended to and was in force in Puerto Rico and that it intended the Clayton Act should be extended and in force there also. It thus appears that the Sherman Act was in force in Puerto Rico in 1907 when the local act, upon which this prosecution is based, was passed, and manifestly so on and after October 15, 1914, and when this prosecution was begun on May 28, 1934.

Having reached this conclusion, the question remaining to be considered is whether the Act of March 14, 1907, was superseded or invalidated by the Sherman Act of 1890.

The contention of the appellant is that the Sherman Act did not supersede or invalidate the local act of 1907; that the latter act was not in conflict with the former, either as to the subject-matter involved in the two acts defining the crime, or as to the jurisdiction of the respective courts over the same.

It is to be noted that section 1 of the local act of 1907 makes the same act or acts criminal in Puerto Rico that section 3 of the Sherman Act (15 U.S.C.A. § 3), also in force in Puerto Rico, likewise makes criminal there, and that jurisdiction of the offenses denounced in the local act is conferred upon the island District Courts, while jurisdiction of offenses denounced by the Sherman Act is conferred on the federal District Court for the island. In this situation it can hardly be said that these provisions of the act of 1907 are merely supplementary to the provisions of the Sherman Act and do not cover the same ground and conflict with its provisions.

As these provisions of the two acts, both of which relate to Puerto Rico, cover the same ground and are necessarily in

conflict with one another, does the act of Congress supersede or invalidate the local act?

The Supreme Court of Puerto Rico had previously considered this question in United Theatres, Inc., v. District Court of San Juan, 47 P.R.R. 725. It based its ruling in that case largely upon the decision of the Supreme Court of the United States in El Paso & N. E. R. Co. v. Gutierrez, 215 U.S. 87, 30 S.Ct. 21, 54 L.Ed. 106. That case arose under the Employers' Liability Act of June 11, 1906, 34 Stat. 232, the court having previously held that the portion of the act relating to interstate commerce was unconstitutional. Two questions were involved: (1) The constitutionality of the act as applied to trade and commerce in the territories of the United States; and (2) if constitutional as applied to trade and commerce in the territories, whether it was the exclusive and paramount law, the enforcement of which the territorial Legislature of New Mexico could not limit or destroy by the enactment of a law making it a condition precedent to the injured employee's right to maintain an action under it, that, within 90 days after the accident and 30 days before the commencement of a suit, he should serve upon the defendant an affidavit covering ·certain particulars as to the injuries complained of and containing the names and addresses of all witnesses of the happening of the alleged acts of negligence.

The provisions of that act (Act of June 11, 1906) were held constitutional so far as they related to trade and commerce in the territories; and the Territorial Act of March 11, 1903 (Laws N.M.1903, c. 33), in so far as it imposed a condition precedent to the maintenance of a suit under the Act of June 11, 1906, was held superseded by the later act. As to this branch of the case the court said (215 U.S. 87, at page 93, 30 S.Ct. 21, 23, 54 L.Ed. 106):

"In view of the *plenary power* of Congress under the Constitution over the territories of the United States, subject only to certain limitations and prohibitions not necessary to notice now, there can be no doubt that an act of Congress undertaking to regulate commerce [by common carriers] in the District of Columbia and the territories of the United States *would necessarily supersede* the territorial law regulating the same subject." (Italics supplied.)

The basis of this decision was that the power of Congress to legislate for the territories was plenary, and, it having seen fit to enact the statute, the provisions of that law as to the matters there dealt with were necessarily exclusive and the local Legislature, under its authority as an agency of Congress to legislate for the territory, was without power to limit or defeat the act of Congress.

The counterpart of that case, holding that the Employers' Liability Act of Congress was the paramount and exclusive law on the subject in the territories, is the case of Santa Fe Cent. Ry. Co. v. Friday, 232 U.S. 694, 698, 34 S.Ct. 468, 58 L.Ed. 802, holding that jurisdiction of the federal District Court of a territory is original and exclusive over an action arising under the Employers' Liability Act of Congress, which the Legislature of the territory could not take away, if it attempted to do so.

The rule applied in the El Paso Case had previously been stated in Davis v. Beason, 133 U.S. 333, at page 348, 10 S.Ct. 299, 302, 33 L.Ed. 637. It was there said:

"The cases in which the legislation of congress will supersede the legislation of a * * * territory, without specific provisions to that effect, are those in which the same matter is the subject of legislation by both. There the action of congress may well be considered as covering the *entire ground.*" (Italics supplied.)

That was a case in which the part or portion of the territorial statute on which the indictment was based was not covered by or embraced within the act of Congress, although the act of Congress covered another portion of the territorial act, as to which the indictment did not relate and upon which it was not based; and, inasmuch as the act of Congress simply declared "that no polygamist, bigamist, or any person cohabiting with more than one woman * * * shall be entitled to vote, etc.," and did "not touch upon teaching, advising, and counseling the practice of bigamy and polygamy, that is, upon aiding and abetting in the commission of those crimes, nor upon the mode adopted, by means of the oath required for registration, to prevent persons from being enabled by their votes to defeat the criminal laws of the country," it was held that, as the act of Congress did not cover that portion of the subject-matter that the legislation of the territory did and upon which the indictment was based, the former did

not supersede the latter, but supplemented it. Both acts prevented a bigamist or polygamist from voting, but a violation of that portion of the territorial act was not involved or charged in the indictment. Had the charge been based upon the specific matter covered by both the act of Congress and of the Territory, the rule above quoted would undoubtedly have been applied.

Substantially the same position as that taken in the El Paso Case was taken by this court and the Supreme Court of the United States in National City Bank v. Domenech, 71 F.(2d) 13, and Domenech v. National City Bank, 294 U.S. 199, 55 S. Ct. 366, 79 L.Ed. 857, wherein the Legislature of Puerto Rico undertook to enact a law authorizing the imposition of a tax upon the capital assets of a national bank located in New York and having a branch bank in Puerto Rico. The Supreme Court, in discussing the question (294 U.S. 199, at page 204, 55 S.Ct. 366, 369, 79 L.Ed. 857), said:

"Puerto Rico, an island possession, like a territory, is an agency of the federal government, having *no independent sovereignty* comparable to that of a state in virtue of which taxes may be levied. Authority to tax must be derived from the United States. But like a state, though for a different reason, such an agency may not tax a federal instrumentality. A state, though a sovereign, is precluded from so doing because the Constitution requires that there be no interference by a state with the powers granted to the federal government. A territory or a possession may not do so because the dependency may not tax its sovereign. True the Congress may consent to such taxation; but *the grant to the island of a general power to tax* should not be construed as a consent. Nothing less than an act of Congress clearly and explicitly conferring the privilege will suffice." (Italics supplied.)

There the insular Legislature was not permitted to exercise its legislative power to limit and perhaps destroy an agency of the government which an act of Congress had created, without the clear and explicit consent of Congress. So here the insular possession is not permitted to limit or defeat the operation and enforcement of the congressional act without such clear and explicit consent; and it is not claimed that Puerto Rico has been given such consent.

It is urged that the Supreme Court expressly held to the contrary in Grafton v. United States, 206 U.S. 333, 27 S.Ct. 749, 51 L.Ed. 1084, 11 Ann.Cas. 640. But this is not so. The main question there decided was the question of double jeopardy. On page 355 of 206 U.S., page 755 of 27 S.Ct., 51 L.Ed. 1084, 11 Ann.Cas. 640 in that case the court states:

"But, passing by all other questions discussed by counsel, or which might arise on the record, and restricting our decision to the above question of double jeopardy, we adjudge that, consistently with the above act of 1902, and for the reasons stated, the plaintiff in error, a soldier in the Army, having been acquitted of the crime of homicide, alleged to have been committed by him in the Philippines, by a military court of competent jurisdiction, proceeding under the authority of the United States, could not be subsequently tried for the same offense in a civil court exercising authority in that territory. This is sufficient to dispose of the present case."

It there appeared that the respondent Grafton had been adjudged guilty of homicide, as defined in the Penal Code of the Philippines, and sentenced to imprisonment for twelve years and one day by the Court of First Instance in the Province of Iloilo, which judgment had been affirmed in the Supreme Court of the Philippines. It further appeared that, prior to his trial and conviction in the courts of the island, Grafton, a soldier in the Army of the United States, had been tried before a general court-martial in 1904 for a crime less than a capital offense, under the penal law of the island, and had been acquitted. And the question was whether the acquittal by the court-martial was a bar to the prosecution in the island courts for the same offense and that he could not be twice punished for the same act. The subsidiary question which the court had to decide was whether the general court-martial had jurisdiction of the offense set forth in the charge and conviction. Under the penal laws of the Philippines homicide was not a capital offense. In discussing the question of jurisdiction the court (206 U. S. 333, at page 348, 27 S.Ct. 749, 752, 51 L.Ed. 1084, 11 Ann.Cas. 640) said:

"The 62d Article of War, in express words, confers upon a general, or a regimental, garrison, or field officers' court-martial, according to the nature and degree of the offense, *jurisdiction* to try 'all

·crimes' *not capital,* committed in time of peace by an officer or soldier of the Army. The crimes referred to in that article manifestly embrace those *not capital,* committed by officers or soldiers of the Army *in violation of public law as enforced by the civil power.* No crimes committed by officers or soldiers of the Army are excepted by the above article from the jurisdiction thus conferred upon courts-martial, except those that are capital in their nature. While, however, the jurisdiction of general courts-martial extends to all crimes, not capital, committed against *public law* by an officer or soldier of the Army within the limits of the territory in which he is serving, this jurisdiction is *not exclusive,* but *only concurrent* with that of the civil courts. Of such offenses courts-martial may take cognizance under the 62d Article of War, and, if they first acquire jurisdiction, their judgments cannot be disregarded by the civil courts for mere error or for any reason not affecting the jurisdiction of the military court." (Italics supplied.)

This clearly shows that the question we have here was not and could not have been decided by the court in that case, for there the crime charged before the general court-martial was not a violation of a penal law of the United States but a violation of a local penal law as "enforced by the civil power" and committed by "an officer or soldier of the Army within the limits of the territory in which he is serving." All that the act of Congress (62d Article of War) operated to effect was the conferring of jurisdiction upon the general court-martial over the perpetration of a crime, less than capital, denounced by the public law of the Philippine Islands. There both the general court-martial and the courts of the Island had jurisdiction to try Grafton for the offense. Their jurisdiction was concurrent and the one that first acquired jurisdiction over the cause and the parties had authority to hear and determine the matter. This the general court-martial had done. Grafton could not be tried and sentenced a second time for the same act—a violation of the same local Penal Code. In that case the Legislature of the Philippines alone had denounced the acts there complained of as a crime, not Congress; while here both the Congress and the Legislature of Puerto Rico have made the same act or acts a crime in Puerto Rico. This clearly shows why the question now

before us was not and could not have been decided in the Grafton Case, for the statute denouncing the act charged and attempted to be enforced in both courts was a statute of the Islands and there was no act of Congress in force in the Philippines making that act a crime.

But here the subject-matter covered by the Puerto Rican statute and upon which the information is based is the same as the subject matter covered by the act of Congress of 1890; and the *act charged* in the information and denounced as a crime by the island statute and over which the insular courts are given jurisdiction, is the same as that denounced as a crime in the act of Congress of 1890, over the prosecution of which the federal District Court of Puerto Rico has original and exclusive jurisdiction. In each instance the offense was a crime against the sovereignty of the United States, but the act of Congress is the paramount law on the subject. The island courts, if they could be said to have acquired jurisdiction of the offense, would not exercise a concurrent jurisdiction with that of the federal District Court, but an independent one, and, if exercising an independent one, a judgment of conviction there imposed would not constitute double jeopardy as respects a like conviction for the same act in the federal District Court. But such is not the case. There being a single sovereignty whose laws are violated and for which there can lawfully be but one punishment, and the act of Congress being the supreme law, there can be but one conclusion and that is that the act of 1890 pre-empted the ground or superseded the local act relating to the same matter, and that the island district court was without jurisdiction of the offense.

Certain decisions of the Supreme Courts of the Territories have been called to our attention, which are said to involve the question now before us.

In Territory v. Alexander, 11 Ariz. 172, 89 P. 514, 515, the question involved was the same as here under consideration, and the territorial court, following the reasoning of the Supreme Court in Davis v. Beason, supra, reached the same conclusion as the Supreme Court of Puerto Rico has in this case and in the case of the United Theatre, Inc., v. District Court of San Juan, and declined to follow the decisions of the Supreme Courts of Wyoming, Montana and Utah. In re Murphy, 5 Wyo. 297, 40 P. 398; Territory v. Guyott, 9' Mont.

46, 22 P. 134; State v. Norman, 16 Utah, 457, 52 P. 986, 988.

In State v. Norman, supra, a statute of the Territory of Utah made polygamy, adultery, and other kindred offenses crimes in the Territory, and an act of Congress previously enacted did the same. The court, in its opinion, treated a territory like a state and as having a sovereignty independent of that of the United States, and held that a conviction for a violation of the federal act would not relieve the defendant from being prosecuted for a violation of the territorial act. The court said:

"Each inhabitant of the territory of Utah was also an inhabitant of the United States, and was therefore a subject of each government, and owed allegiance to and was amenable to the laws of each. If, therefore, he perpetrated an act which constituted an offense against the United States, and also an offense against the territory and its local laws, we know of no legal principle which prevented him from becoming subject to punishment by each government, and neither of such punishments would be in contravention of the constitutional inhibition against the twice putting in jeopardy for the same offense."

We cannot follow a case based on such reasoning. Chief Justice Zane, dissenting in that case, in the course of his opinion said:

"While the law of congress remained in force, the territory could not make one prohibiting and punishing the same offense. But, five years after the United States law went into effect, the territory, in the same terms, attempted to enact the law in question.

"The opinion of the court declares, in effect, that congress passed the law prohibiting and punishing adultery because the territories had failed to do so; that is to say, congress passed a law punishing adultery in the territory because the territory refused to do so. The power of the agent to do an act ceases when the principal does the act himself; so the power of the territory to pass the law punishing adultery ceased when the United States passed the law for itself. The act of congress in question was made for the same territory and to protect the same people from the evil effects of adultery and fornication that the territorial law covered. * * *

"The congressional law and the territorial law in this case proceed from the same source,—from the United States,— and are for the same territory and the same people. It is the same power, exercised in the one case by congress, and in the other by the territory.

"It would appear strange, indeed, if the territorial legislature, the instrumentality of congress, could exercise the same power, in punishing the same offense against the same people, after congress has itself exercised it, and punished the same offense against the same people. In that case the act of the territorial legislature is vain and of no effect."

It is doubtful whether the case of Territory v. Guyott, supra, involves the question we are considering.

The basis of the decision in In re Murphy, supra, is like that of State v. Norman. The court labored under the impression that where the same act constituted a violation of a federal law and a law of the territory, a person might be prosecuted and punished under each statute; that a territory stood in the same relation as a state to the government of the United States.

Territory v. Long Bell Lumber Co., 22 Okl. 890, 99 P. 911, follows the reasoning of the Murphy Case. And in Wagner v. Minnie Harvester Co., 25 Okl. 558, 106 P. 969, the court followed its decision in the case of Territory v. Long Bell Lumber Co.

The case of Knudsen v. Hannberg, 8 Utah, 203, 30 P. 749, 752, is distinguishable and not in conflict with our conclusion in this case. There the act of congress endowed the widow with one-third part of all lands whereof the husband was seised, while, under the law of succession of the territory, the widow was "entitled to one third of all the real estate *remaining after the dower is set off* to her, and also to an undivided one third of all the personal property after the debts, costs, and expenses attending the settlement of the estate are paid"; and the court held:

"Consequently the widow should have a dower interest, a life estate, to the extent of one third of all the real estate whereof the husband died seised; and under the law of succession the widow is entitled to one third of all the real estate *remaining* after the dower is set off to her, and also to an undivided one third of all the personal property after the debts, costs, and expenses attending the settlement of the estate are paid. The three minor heirs are

each entitled by succession to the undivided one third of the remaining two thirds of the real estate and personal property subject to the widow's right of dower as above stated."

The judgment of the Supreme Court of Puerto Rico is affirmed, with costs to the appellees.