TERRITORY v. LONG BELL LUMBER Co. *et al.*

SAME v. OKLAHOMA MILL & ELEVATOR Co. *et al.*

SAME v. HAINES *et al.*

Nos. 2099, 2100 and 2101, Okla. T.    Opinion Filed December 21, 1908.

(99 Pac. 911.)

1.    TERRITORIES—Status.    A territory, under the Constitution and laws of the United States, is an inchoate state—a portion of the country not included within the limits of any state, and not yet admitted as a state into the Union, but organized under the laws of Congress, with a separate Legislature, under a territorial Governor, and other officers appointed by the President and Senate of the United States.

2.    SAME—"Legislative Power."    The legislative power of the territory of Oklahoma extended to all rightful subjects of legislation pertaining to local self-government when not inconsistent with the Constitution and laws of the United States, and when the exercise of such power did not in any way interfere with the supreme right of Congress to control its governmental affairs.

3.    SAME—Legislative Power—Anti-Trust Legislation.    Chapter 83, Wilson's Rev. & Ann. St. Okla. 1903, being an enactment of the legislative assembly of the territory of Oklahoma passed December 25, 1890, entitled "An act to prevent combinations in re-

straint of trade," is not in conflict or inconsistent with the Constitution or laws of the United States nor with an act on the same subject applicable to territories, enforceable by the federal authorities, passed by Congress July 2, 1890 (Act Cong. July 2, 1890, c. 637, 26 Stat. 209 [U. S. Comp. St, 1901, p, 3200]) and was a valid statute of the territory of Oklahoma.

4.    **SAME.**  The fact that a prosecution for a violation of the terms of such territorial statute would also be a violation of and punishable under the federal act in no wise affects its validity.

5.    **MONOPOLIES — Complaint — Injunction — " Public    Nuisance. "**  Where it is alleged that certain parties in violation of such act of the territorial Legislature had entered into and become members of a pool, trust, agreement, combination, and understanding with each other to create a monopoly in the business of buying and selling lumber, coal, and grain, and that, acting thereunder, they were enabled to and were charging the public unjust, unreasonable, and exorbitant prices for such commodities, and preventing others from engaging in such business, such acts constitute a public, common nuisance, and the parties thereto may be restrained as provided for in section 4440, Wilson's Rev. & Ann. St. Okla. 1903, at the suit of the county attorney.

(Syllabus by the Court.)

*Error from District Court, Kingfisher County; C. F. Irwin, Judge.*

Actions by the Territory of Oklahoma against the Long Bell Lumber Company and others, and against the Oklahoma Mill & Elevator Company and others, and against A. T. Haines and others. Judgments for defendants, and the territory brings error. Reversed and remanded.

The above-entitled cases were all brought in the district court of Kingfisher county, Okla., in the month of October, 1906, by the county attorney of the county, the petitions being signed by him as such official and verified as provided by the statute. Omitting the formal parts, the first cause of action stated in the petition of the case where the Long Bell Lumber Company, the A. H. Showalter Lumber Company, and Butts Bros. Lumber Company are defendants reads as follows:

"That said defendants have been engaged in said business for several years last past, and all of said time they have federated together, and have, by express agreement with each other, either

written or oral, controlled all the business of buying and selling lumber at said point in such a manner as to create a monopoly for the benefit of said corporations, and greatly to the injury of the public and the people of the county of Kingfisher, and the territory of Oklahoma. That, by means of said confederation, combination, and monopoly, said defendants are enabled to and do keep other persons desiring to enter said business from doing so, and they not only fix the prices that said lumber shall be purchased at from the mills, but also arbitrarily fix the price for which said lumber shall be sold to the consumer and have for several years last past, do now, and will continue to, unless restrained by the court, completely shut out competition in the lumber business in said city of Kingfisher, and said defendants have for several years last past, and do now, and will continue to, if not restrained by the court, charge the public and the people of Kingfisher county, and the territory of Oklahoma, unjust, unreasonable, and exorbitant prices for lumber, and by reason of the monopoly of said defendants created by said defendants said public and the people of Kingfisher county and territory of Oklahoma cannot buy lumber elsewhere, but are compelled, by reason of said monopoly, to purchase their lumber from said defendants, and from no other person or corporations. That each of the above-named defendants are apparently conducting a separate business under the respective names of their corporations, but in truth and in fact, by reason of the combination and monopoly created by said defendants, there is no competition in the sale of lumber in said city, nor will said defendants permit any one else to engage in the business of lumber dealers therein. That said defendants have conducted the aforesaid combination and monopoly for a good many years last past, to the great loss and injury of the public and to the people of the county of Kingfisher and territory of Oklahoma, and threaten to, and will continue to, violate the anti-trust law of the territory of Oklahoma and the United States, unless restrained by the courts. That for these impositions the public and the people of Kingfisher county and Oklahoma Territory have no speedy and adequate remedy at law."

The second cause of action sets forth substantially that the defendants have by agreement between themselves combined to suppress evidence which will enable the officers to enforce the anti-trust law. The prayer is for an injunction restraining the parties

from carrying on and conducting the business combination and monopoly, and from further combining and federating together for the purpose of defeating the operation of said law. The language used in the petitions filed in the second and third cases, and the averments of the same, are identical with the petition in the first case, except that in the second case grain was the commodity which was alleged the combination operated upon, and in the third case it was coal which had thus been brought within the control of the contract made between the parties.

The cases all took identically the same course in the lower court, in that temporary injunctions were obtained in each from the judge of the probate court, and on motion in the district court the same were dissolved and the petitions dismissed. From this action the territory of Oklahoma took each of said cases to the Supreme Court by proceedings in error where they were pending at the time Oklahoma and Indian Territory were erected into a state They have now been consolidated, and are before this court for consideration by virtue of our succession to the territorial Supreme Court under the terms of the Enabling Act (Act June 16, 1906, c. 3335, 34 Stat. 267) and the Schedule to the Constitution (Bunn's Ed. §§ 449-493).

*Chas. J. West,* Atty. Gen, *George L. Bowman,* Co. Atty., and *Matthew John Kane,* for the Territory.

*F. L. Boynton, W. R. Cowley,* and *W. A. Ledbetter,* for defendants in error.

Dunn, J. (after stating the facts as above). Wilson's Rev. & Ann. St. Okla. 1903, § 4440, provides:

"An injunction may be granted in the name of the territory to enjoin and suppress the keeping and maintaining of a common nuisance. The petition therefor shall be verified by the county attorney of the proper county, or by the attorney general, upon information and belief, and no bond shall be required."

It was under the authority conferred on the county attorney by this section of the statute that he acted in bringing these suits, beginning them upon petitions which he verified on his infor-

mation and belief, and securing injunctive relief in the name of the territory without bond. The position taken by him was that a monopoly or combination in restraint of trade such as is delineated and set forth in the petitions was a public or common nuisance, and as such that courts of equity at the instance of the public prosecutor had power to suppress the same.

The consideration and determination of two propositions will in our judgment cover and dispose of all the controverted questions raised. These are: First, was the territorial anti-trust act a valid, existing law at the time of the institution of these suits; and, second, if so, did the violation of its terms as averred constitute and make the result of such acts a common and public nuisance?

Incidental to the first proposition, there is argued in the briefs of defendants in error the proposition that the territorial authorities were without jurisdiction or power to proceed under the terms of what is generally known as the "Sherman Anti-Trust Act," passed by Congress on July 2, 1890 (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3201]), section 3 of which is made specifically applicable to territories, and section 4 thereof vesting the several Circuit Courts of the United States with jurisdiction to prevent and restrain violations of the act, and making it the duty of the several district attorneys of the United States under the direction of the Attorney General to institute suits in equity for such purpose. This question has been squarely passed upon in the case of *Greer, Mills & Co. v. Stoller* (C. C.) 77 Fed. 1, wherein it was held that the statute against unlawful restraints and monopolies (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]) does not authorize the bringing of injunction suits or suits in equity by any parties except the government. *Blindell et al. v. Hagan et al.* (C. C.) 54 Fed. 40; Beach on Monopolies and Industrial Trusts, § 226. So that this theory may be disposed of on these authorities, and the question then arises: Was the anti-trust act passed by the Legislature of the territory of Oklahoma on December 25, 1890, contained in

chapter 83, Wilson's Rev. & Ann. St. Okla. 1903 (sections 6739-6743), a valid existing law of the territory of Oklahoma at the time of the institution of these suits? It will be noted that the federal anti-trust act was passed on the 2d day of July, 1890, while the act of the territorial Legislature was passed about six months thereafter, and plaintiffs in error contend that, Congress having legislated on the subject, its legislation was exclusive so far as the territorial Legislature was concerned, in that it could pass no act covering the same field which could stand concurrently with the federal legislation on the subject. The rule contended for is stated in the case of *Allen v. Reed*, 10 Okla. 105-111, 60 Pac. 782, 784, and is as follows:

"Whenever Congress legislates upon any subject directly in relation to the government of the people of the territory, then it ceases to be a rightful subject of territorial legislation, and any law that the Legislature of the territory has enacted or enacts upon the same subject which Congress has assumed to legislate upon, is inconsistent with such laws of the United States, and is, therefore, void."

In order that the scope and purpose of the two acts brought to the attention of the court by reason of this controversy may be clearly before us, we quote that portion of the federal anti-trust act relating to this subject, which is as follows:

"Every contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce in any Territory of the United States or of the District of Columbia, or in restraint of trade or commerce between any such Territory and another, or between any such Territory or Territories, and any State or States or the District of Columbia or with foreign nations, or between the District of Columbia and any State or States or foreign nations, is hereby declared illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

The territorial act on the same subject is as follows:

"Sec. 1. If any individual, firm, partnership or any association of persons whatsoever, shall create, enter into, become a member of, or a party to, any pool, trust, agreement, combination or understanding with any other individual firm, partnership or association of persons whatsoever, to regulate or fix the price of, or prevent or restrict, the competition in the sale of provisions, feed, fuel, lumber, or other building materials, articles of merchandise or other commodity (they) shall be deemed guilty of (a) misdemeanor and upon conviction thereof shall be fined not less than fifty nor more than five hundred dollars.

"Sec. 2. It shall not be lawful for any corporation organized under the laws of this Territory, or organized under the laws of any other territory or state, and doing business in this Territory, to enter into any combination, contract, trust, pool or agreement with any other corporation or corporations, or with any individual, firm, partnership or association of persons, whatsoever, for the purpose of regulating or fixing the price of, or preventing or restricting competition, in the sale of provisions, feed, fuel, lumber, or other building materials, articles of merchandise, or other commodity, including the fixing of the rate of interest. (Any) president, manager, director, agent, receiver or other officer of any such corporation, violating the provisions of this section shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than fifty nor more than five hundred dollars, for the first offense, and upon a second conviction shall be fined a sum equal to twice the amount of the first fine, and such corporation shall forfeit its corporate right and franchise, and its corporate existence, in this Territory, shall thereupon cease and determine.

"Sec. 3. Any person purchasing provisions, feed, material, articles of merchandise, or any commodity from any individual, firm, partnership, or corporation, transacting business in violation of the provisions of this act, such person so purchasing shall not be liable for the price or payment of any such article or commodity and may plead this act, as a defense in any suit for price or payment. In any civil action brought under the provisions of this section, the court before whom such suit shall be pending may compel the plaintiff to testify, but if the plaintiff be a corporation then the court may compel any officer, agent, or employe of such corporation to attend, appear, and testify, or compel the production of any contract, or papers in evidence in such civil action: Provided, the evidence so obtained shall not be used in any crim-

inal prosecution against the person so testifying except in a criminal prosecution for perjury committed in giving such testimony.

"Sec. 4. Any person who shall have purchased from any individual, firm, partnership or corporation, doing business in violation of the provisions of this act, any provisions, feed, fuel, lumber or other building material, articles of merchandise, or other commodity and paid for the same, may maintain a civil action to recover the full amount of damages sustained in consequence .of any such violation of the provisions of this act, together with a reasonable attorney's fee to be fixed by the court, .which attorney's fee shall be taxed and collected as part of the costs in such case. In any civil action brought under the provisions of this section, the court before whom such suit be pending may compel the defendant to testify, but if the defendant be a corporation, then the court may compel any officer, agent or employe of such corporation to attend, appear, and testify or compel the production of any contract or papers as evidence in such civil action: Provided, the evidence so obtained shall not be used in any criminal action against the person so testifying, except in a criminal prosecution for perjury committed in giving such testimony.

"Sec. 5. It shall be the duty of the prosecuting attorneys in their respective counties, to enforce the foregoing provisions of this act, and any prosecuting attorney securing a conviction under provisions of this act, shall be entitled in addition to such fee or salary as by law he is allowed for such prosecution, to onefifth of the fine received."

The foregoing act of the territorial Legislature, while striking at the identical evil legislated against in the act of Congress, it will be seen contains numerous provisions not provided for under the former. Territories, being portions of the United States not yet created into states, and Congress having been given, the power to dispose of and make all needful rules and regulations therein, have just such authority to legislate as is conferred upon them by Congress, limited as both are by the Constitution. Congress not only may abrogate the laws of any of the territories, but it may itself, if it chooses, legislate directly for the entire local government. It may make a valid act of the Legislature void, and

a void act valid. It has complete legislative authority over the people inhabiting the territories and all of the departments of the territorial government. It may restrict all legislation for a territory to itself or it may portion it out to subordinate bodies; but, when these bodies act, they act by virtue of federal authority, and their legislation is federal legislation applicable solely to their local conditions. This authority in the territory of Oklahoma is contained and set out in section 6 of the Organic Act (Act May 2, 1890, c. 182, 26 Stat. 84), as follows:

"That the legislative power of the territory shall extend to all rightful subjects of legislation, not inconsistent with the Constitution and laws of the United States, but no law shall be passed interfering with the primary disposal of the soil; no tax shall be imposed on the property of the United States, nor shall the lands or other property of nonresidents be taxed higher than the lands or other property of residents, nor shall any law be passed impairing the right to private property, nor shall any unequal discrimination be made in taxing different kinds of property, but all property subject to the taxation shall be taxed in proportion to its value."

Section 4 of the Organic Act places the legislative power and authority of the territory of Oklahoma in the Governor and legislative assembly. Section 6 of the Organic Act, *supra,* not only confers the authority subject to the reserved power mentioned, but contains specific limitations imposed upon the exercise of the authority. Within the limitations noticed, the legislative power for local self-government is quite as extensive in a territory as in a state. The policy of the government is to give to it the fullest opportunity to govern itself and prepare for statehood.

The Supreme Court of the United States in the case of *Clinton v. Englebrecht,* 13 Wall. 434, 20 L. Ed. 659, has specifically so held. The court said:

"The theory upon which the various governments for portions of the territory of the United States have been organized has ever been that of leaving to the inhabitants all the powers of self-government consistent with the supremacy and supervis-

ion of national authority, and with certain fundamental principles established by Congress."

. This in our judgment is a correct statement of the rule involved, and the determination of the extent to which Congress has granted the right to the territory of Oklahoma to legislate must be ascertained from a construction of the powers specifically granted in section 6 of the Organic Act, *supra*, taken in connection with the manifest policy of the government in granting the power of legislation upon all rightful subjects of legislation as set forth above. If the act of the territorial Legislature passed for the purpose of making effective and enforcible by its own authorities, an act to prevent combinations in restraint of trade, was not in conflict and in no wise interfered with or affected the enforcement by the federal authorities of the act of Congress, then it occurs to us that there is no good reason for saying that the same was annulled and rendered nugatory as soon as enacted by such previous act. There is nothing in the federal act prescribing or prohibiting to the legislative authority of the territory the right to legislate upon this identical subject, nor is the same contained in any act of Congress to which our attention has been called. The right to legislate upon this subject and to have its act enforced by its own authorities was a valuable one to the people inhabiting the territory, and it ought not to be taken away by any strained or arbitrary construction.

Attention is particularly directed to the numerous provisions making certain its enforcement which are not contained in the federal act, and which perhaps are not available to the prosecutors under it. It will be noted that the punishment prescribed by the federal act is simply a fine and imprisonment of the persons who make such contract, while under section 2 of the local statute a second conviction of any corporation violating its provisions brings upon its corporate life a sentence of death, and its existence in the territory terminates. Section 3 provides that any person purchasing from such illegal organization shall not be liable for the price or payment for any article or commodity so

purchased, and likewise contains a complete and effective provision for securing evidence of the offense. Section 4 provides that any person who shall have purchased from such organization and paid for the commodity is authorized to maintain an action to recover the full amount of damages sustained in addition to a reasonable attorney's fee. It likewise provides for the production of evidence to aid the court in the ascertainment of the facts. Section 5 makes it the duty of the prosecuting attorneys of the several counties to enforce the act, and, in order to insure vigilance on their part, offers to each who secures a conviction a fifth of the fine. These additional provisions in no wise conflict with the federal act, and the same rule, that repeals by implication are not favored, pertains to the annulment of statutes in cases of this character. The United States Supreme Court in the case of *Cope v. Cope,* 137 U. S. 682, 11 Sup. Ct. 222, 34 L. Ed. 832, says:

"Annulments of statutes by implication, like repeals by implication, are not favored by the courts. No statute of a territory will be declared void because it may indirectly or by a construction which is possible but not necessary be repugnant to an act of Congress annulling legislation of the territory; but such a result must be direct and proximate in order to invalidate the statute."

The act under which these proceedings were brought had at that time been on the statute books of the territory of Oklahoma for nearly 16 years. It was passed almost immediately after the approval of the federal act. This at least was a construction on the part of the territorial Legislature that it was necessary and essential, and that its terms were not repugnant to the federal act. Furthermore, section 1850 of the Revised Statutes of the United States provides that "all laws passed by the legislative assembly and Governor of any territory (except certain territories not material here) shall be submitted to Congress, and, if disapproved, shall be null and of no effect." Section 3 of the Organic Act made it the specific duty of the Secretary of the territory of Oklahoma to transmit two copies of the laws of each legislative assembly

within 30 days after its adjournment to the presiding officers of the Senate and House of Representatives of the United States. This act doubtless in accordance therewith was presented to Congress and the fact that it was not disapproved is again a legislative construction making in favor of its validity.

In the case of *Clinton v. Englebrecht, supra,* speaking of the controverted act passed by the territory in that case, and of this provision of the federal statutes, Mr. Chief Justice Chase, who delivered the opinion of the court, said:

"In the first place, we observe that the law has received the implied sanction of Congress. It was adopted in 1859. It has been upon the statute book for more than 12 years. It must have been transmitted to Congress soon after it was enacted, for it was the duty of the Secretary of the territory to transmit to that body copies of all laws on or before the 1st of the next December in each year. The simple disapproval by Congress at any time would have annulled it. It is no unreasonable inference, therefore, that it was approved by that body."

In addition to the foregoing reasoning, which in our judgment tends to the conclusion that this was a valid act of the territorial Legislature when passed, a number of judges and courts have had occasion to pass upon the identical question which is here presented to us, and a rule substantially correct is, we believe, annunciated in an opinion prepared by Judge Irwin of the Supreme Court of the territory of Oklahoma in the case of *Territory ex rel. Ridings v. Neville et al.,* 10 Okla. 79, 60 Pac. 790. This opinion, although not receiving the sanction of the majority of the members of that court, in our judgment expresses the law upon this proposition. He said:

"The territorial Legislature, being the representatives of the people of the territory, have the right to legislate for the people upon all subjects which are not in conflict with the Constitution of the United States, and do not in any way interfere with the supreme right of the United States government to direct and control the governmental affairs of the territory."

The foregoing in our judgment expresses the correct rule obtaining in reference to the power of the constituted legislative

body of a territory to legislate in reference to matters with which Congress has likewise dealt. In this conclusion we are supported by a number of authorities. ·Cooley's Constitutional Limitations (7th Ed.) p. 54, note 1; *State v. Norman,* 16 Utah, 457, 52 Pac. 986; *Territory v. Guyott,* 9 Mont. 46, 22 Pac. 134; *Knudsen v. Hannberg et al.,* 8 Utah, 203, 30 Pac. 749; *In re, Murphy,* 5 Wyo. 297, 40 Pac. 398; *Davis v. Beason,* 133 U. S. 333, 10 Sup. Ct. 299, 33 L. Ed. 637; *Cope v. Cope,* 137 U. S. 682, 11 Sup. Ct. 222, 34 L. Ed. 832.

The law declared by the Supreme Court of. Wyoming in the case of *In re Murphy, supra,* is as follows:

"The fact that the Congress of the United States had enacted a law defining and punishing the crime of bigamy in the territories and other places over which the United States have exclusive jurisdiction did not restrict or impair the right of the Legislature of the territory of Wyoming to. define and provide a punishment for bigamy as an offense against the territorial sovereignty and its laws."

Such also is the holding of the Supreme Court of Utah in the case of *State v. Norman, supra:*

"The acts of Congress defining 'adultery,' and prescribing punishment therefor, in the territories, as a crime against the United States, were not exclusive of territorial legislation on the same subject, and did not prevent the territorial Legislature from punishing by statute the same act as an offense against the territorial government and its laws."

To the same effect in a degree is the declaration of the Supreme Court of Montana in the case of *Territory v. Guyott, supra:*

"We are aware of the broad distinction between the government of a state and territory, but 'the legislative power of every territory shall extend to all rightful subjects of legislation not inconsistent with the Constitution and laws of the United States.' Rev. St. U. S. § 1851. In *Hornbuckle v. Toombs,* 18 Wall. 655, 21 L. Ed. 966, it is adjudged that, 'as a general thing, subject to the general scheme of local government chalked out by the Organic Act, and such special provisions as are contained therein, the local Legislature has been intrusted with the enactment of the entire system of municipal law, subject, also, however, to the right of

Congress to revise, alter, and revoke at its discretion.' The powers thus exercised by the territorial Legislatures are nearly as extensive as those exercised by any state Legislature."

Nor is it any argument against the validity of this act that a violator of it was liable to be prosecuted twice for the same offense. *In re Murphy*, 5 Wyo. 297, 40 Pac. 398; *Harlan v. People*, 1 Doug. (Mich.) 207; *Miners' Bank v. State of Iowa*, 12 How. 1. 13 L. Ed. 867. The rule in this respect is properly declared by the Supreme Court of Montana in the case of *In re Murphy, supra*, as follows:

"The contention that the law of the territory was not valid, because the same act was punishable as a crime under the laws of of the United States, and therefore, if both were in force, the person committing the crime would be subject to punishment twice for the same offense, is not sound, as the federal government could punish it as a crime against it while at the same time it might be a crime punishable under the laws of the territory. In this respect there is no distinction between a state and a territory in their respective relations to the general government."

We therefore conclude that the anti-trust act of the Legislature of the territory of Oklahoma was not repugnant to or in conflict with the federal anti-trust act or any other constitutional or congressional limitation, and was a valid, existing statute of the territory of Oklahoma.

This conclusion on our part brings us to by far the most serious question in the case; that is, whether or not the allegations contained in the petitions bring these defendants within the terms of the statute of the territory defining a public nuisance. Section 1, c. 56, Wilson's Rev. & Ann. St. Okla. 1903, provides as follows:

"A nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either: First. Annoys, injures or endangers the comfort, repose, health, or safety of others; or, Second. Offends decency; or, Third. Unlawfully interferes with, obstructs or tends to obstruct, or renders dangerous for passage, any lake or navigable river, bay, stream, canal or basin, or any public park, square, street or highway; or, Fourth. In any

way renders other persons insecure in life, or in the use of property."

Section 2 thereof reads as follows:

"A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon the individuals may be unequal."

The county attorney, as first noted, began these actions under section 4440, *supra*. It will be noted that under this statute the term "common nuisance" is used, while the statute defining a nuisance violating the general rights of the public is under section 2, *supra*, denominated a "public nuisance." The meaning of these two phrases as generally understood by the courts, and the elements entering therein, is illustrated by the statement of the general rule contained in volume 21, p. 683, American and English Encyclopædia of Law, as follows:

"A common or public nuisance is one that affects the people at large, and is a violation of a public right, either by a direct encroachment upon public property or by doing some act which tends to the common injury or by omitting to do, in the discharge of a legal duty, that which the common good requires. It does not necessarily mean one affecting the government or the whole community of the state. It is public if it affects the surrounding community generally, or the people of some local neighborhood, as, for instance, the inhabitants of a village. Nor is it necessary that all persons in the community, or in fact that any individual whatever, should be actually annoyed or injured, but it is sufficient if there is a tendency to the annoyance of the public by an invasion of a right which all are entitled to exercise if they see fit."

It will be noted that the petitions allege that the defendants have become members of a pool, trust, agreement, combination, and understanding with each other to regulate and fix the price of lumber, coal, and grain and to prevent and restrict competition in the sale thereof, and that by virtue of being thus federated together, have so controlled all the business of buying and selling such commodities in the town of Kingfisher as to create a monopoly for their benefit, and, by charging unjust, unreasonable, exorbitant

prices for these commodities, their acts have been and are greatly to the injury of the people of the county of Kingfisher and the territory of Oklahoma; that, by means of said confederation, combination, and monopoly, they are enabled to and do keep other persons desiring to enter said business from doing so, and arbitrarily fix the price which shall be paid for such commodities. and also the price at which they shall be sold to consumers, and that they have thereby completely excluded competition in these lines. Wood on Nuisance, § 51, says. "All monopolies were regarded as nuisances at common law"; and they have received the condemnation of Legislatures and courts from the earliest times.   Forestalling and engrossing in the purchase of commodities in common use were at an early date condemned by the English Parliament, being made punishable by fine and imprisonment, and courts have uniformly denied to parties to contracts in restraint of trade their remedies and relief.   Nearly all of the states of the Union, as well as the federal government, have provisions either in their Constitutions or statutes making them illegal and bringing them under the ban of prosecution on the part of the state.   Where corporations are shown to have been involved, they have been proceeded against by *quo warranto* (*People v. North River Sugar Refining Company,* 22 Abb. N. C. 164, 3 N. Y. Supp. 401; *State ex rel. Snyder v. Portland Natural Gas & Oil Company,* 153 Ind. 483, 53 N. E. 1089, 53 L. R. A. 413, 74 Am. St. Rep. 314: *State ex rel. v. Standard Oil Company,* 49 Ohio St. 137, 30 N. E. 279, 15 L. R. A. 145, 34 Am. St. Rep. 541; *National Cotton Oil Company v. Texas,* 197 U. S. 115, 25 Sup. Ct. 379, 49 L. Ed. 689), or they have been prosecuted under the criminal provisions of the statute (*Smiley v. Kansas,* 196 U. S. 447, 25 Sup. Ct. 289. 49 L. Ed. 546), or the state has proceeded against them by injunction to prevent a continuation of their illegal practices (*Gulf, Colorado & Santa Fe Railway Company et al. v. State of Texas,* 72 Tex. 404, 10 S. W. 81, 1 L. R. A. 849, 13 Am. St. Rep. 815), or the parties thereto have been indicted and prosecuted for conspiracy (*People v. Sheldon et al.,* 139 N. Y. 251, 34 N. E. 785,

23 L. R. A. 221, 36 Am. St. Rep. 690; *People v. Duke,* 19 Misc. Rep. 292, 44 N. Y. Supp. 336; *State ex rel. Durner v. Huegin,* 110 Wis. 189, 85 N. W. 1046, 62 L. R. A. 700; *State v Eastern Coal Company et al.* [R. I.] 70 Atl. 1.) The state of Connecticut proceeded by mandamus in one instance against a railway company compelling it to reinstate train service which it had ceased under contract made with a competing carrier. *State v. Hartford & New Haven Railroad Company,* 29 Conn. 538.

The foregoing cases exemplify some of the different remedies which have heretofore been applied to relieve the public of the effect of unlawful combinations restrictive of free competition, and now we are called on to say whether or not combinations such as are delineated in the petitions herein may be proceeded against in yet an additional way, as for a nuisance; the question being: Do their acts produce such a condition as to bring them within the terms of our statute, to the end that their continuance may be restrained at the instance of a county attorney on a petition supported by his oath or affirmation, upon information and belief and without a bond? The light in which they are held by the courts is manifest from expressions contained in all of the cases where they have been before them. A few of the list and which might easily be extended are as follows: *Butchers' Union Company v. Crescent City Company,* 111 U. S. 746, 4 Sup. Ct. 652, 28 L. Ed. 585; *Richardson v. Buhl,* 77 Mich. 632, 43 N. W. 1102, 6 L. R. A. 457; *Craft et al. v. McConoughy,* 79 Ill. 346, 22 Am. Rep. 171; *Morris Run Coal Company v. Barclay Coal Company,* 68 Pa. 173, 8 Am. Rep. 159; *Charles River Bridge Company v. Warren Bridge et al.,* 11 Pet. 420, 9 L. Ed. 773; *Tuscaloosa Ice Manufacturing Co. v. Williams,* 127 Ala. 110, 28 South. 669, 50 L. R. A. 175, 85 Am. St. Rep. 125.

Mr. Justice Field of the Supreme Court of the United States in his concurring opinion in the case of *Butchers' Union Company v. Crescent City Company, supra,* said:

"As in our intercourse with our fellow men certain principles of morality are assumed to exist without which society would be

impossible, so certain inherent rights lie at the fountain of all action, and upon a recognition of them alone can free institutions be maintained. These inherent rights have never been more happily expressed than in the Declaration of Independence, that new evangel of liberty to the people: 'We hold these truths to be self-evident' (that is, so plain that their truth is recognized upon their mere statement) 'that all men are endowed,' not by edicts of emperors, or decrees of Parliament, or acts of Congress, but 'by their Creator with certain inalienable rights, (that is rights which cannot be bartered away, or given away, or taken away, except in punishment of crime), 'and that among these are life, liberty, and the pursuit of happiness, and to secure these' (not grant them, but secure them) 'governments are instituted among men, deriving their just powers from the consent of the governed.' Among these inalienable rights, as proclaimed in that great document, is the right of men to pursue any lawful business or vocation, in any manner not inconsistent with the equal rights of others, which may increase their prosperity or develop their faculties, so as to give to them their highest enjoyment. The common business and callings of life, the ordinary trades and pursuits, which are innocuous in themselves, and have been followed in all communities from time immemorial, must, therefore, be free in this country to all alike, upon the same conditions. The right to pursue them, without let or hindrance, except that which is applied to all persons of the same age, sex, and condition, is a distinguishing privilege of citizens of the United States, and an essential element of that freedom which they claim as their birthright."

Now the question presents itself: Do the allegations of these petitions bring the defendants within our statute, and constitute of their acts a public common nuisance? In other words, are their doings as set forth such as would annoy, injure, or endanger the comfort, repose, health, and safety, or in any way render at the same time an entire community or neighborhood, or any considerable number of persons, insecure in life or in the use of their property.

An act of the state Legislature of Indiana, (Acts 1893, p. 300, c. 36, § 1) provides:

"That it shall be unlawful for any person, firm, or corporation

having possession or control of any natural gas or oil well, whether as a contractor, owner, lessee, agent, or manager to allow or permit the flow of gas or oil from any such well to escape into the open air without being confined within such well or proper pipes, or other safe receptacle for a longer period than two (2) days next after gas or oil shall have been struck in such well. And thereafter all such gas or oil shall be safely and securely confined in such well, pipes, or other safe and proper receptacles."

The penalty for a violation of this section was provided in the recovery of $200 for each violation, and a further penalty of $200 for each 10 days during which such violation should continue, to be recovered in a civil action in the name of the state, for the use of the county in which such well is located, with attorney's fees and costs of suit. In addition to this remedy, it was provided that persons in the vicinity were authorized to go upon the land where any such well is situated, close and pack the same, and were entitled to sue and recover the expenses thereof with attorney's fees and costs of suit. The Ohio Oil Company, it was alleged, was violating this section of the statute, and the Attorney General of the state and the prosecuting attorney for the Madison circuit court brought suit praying an injunction to restrain it from wasting natural gas. The circuit court sustained a demurrer to the complaint for want of sufficient facts to constitute a cause of action. The plaintiff elected to abide the demurrer, refused to amend or plead further, and the court rendered judgment against the state, from which the state appealed, as did the territory in the case at bar. The complaint alleged that the defendant had "unlawfully permitted the gas produced therein to flow and escape into the open air, whereby many millions of cubic feet of natural gas have been wasted and lost, and whereby the state's supply of natural gas has been greatly diminished, and the property of its citizens within the said gas territory, dependent upon the continued supply of natural gas for fuel as aforesaid, has been greatly damaged and decreased in value." The action brought on the part of the state was, as is the one at bar, to enjoin and restrain a nuisance. The statute of the state of Indiana on nuisances reads:

"Whatever is injurious to health, or indecent, or offensive to the senses, or an obstruction to the free use of property, so as essentially to interfere with the comfortable enjoyment of life or property is a nuisance, and the subject of an action. * * * The nuisance may be enjoined or abated and damages recovered therefor."

On the consideration of the allegations set forth in the petition of the state, and the terms of the statute on nuisances, the court held in the case of *State v. Ohio Oil Company,* 150 Ind. 21, 49 N. E. 809, 47 L. R. A. 627, as follows:

"The facts alleged in the complaint show that the acts of the appellee are such as to essentially interfere with the comfortable enjoyment of life and the property of the citizens of the state. The Supreme Court of Kansas in *State ex rel. Vance v. Crawford,* 28 Kan. 726, 42 Am. Rep. 182, said: 'Every place where a public statute is openly, publicly, repeatedly, continuously, persistently, and intentionally violated is a public nuisance.' The demurrer to the complaint admits that the wells of the appellee are in this category. The Supreme Court of California in a suit by the Attorney General to enjoin the Truckee Lumber Company from discharging sawdust into the Truckee river with the effect of destroying the fish therein, in sustaining the action, which is closely analogous to this action, the court used the following language, which we adopt:

" 'It is alleged that the acts of the defendant have the effect of poisoning the waters of the river, and thereby killing and destroying the fish therein. Anything which is "an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property by an entire community or neighborhood, or any considerable number of persons," is a public nuisance. * * * The fish within our waters constitute the most important constituent of that species of property commonly designated as wild game, the general right and ownership of which is in the people of the state (*Ex parte Maier,* 103 Cal. 476, 37 Pac. 402, 42 Am. St. Rep. 129), as in England it was in the King, and the right and power to protect and preserve such property for the common use and benefit is one of the recognized prerogatives of the sovereign, coming to us from the common law, and preserved and expressly provided for by the statutes of this and every other state in the Union. The complaint shows that by the repeated and continuing acts of defendant this public property right is

being and will continue to be greatly interfered with and impaired; and that such acts constitute a nuisance, both under our statute and at common law, is not open to serious question. *People ex rel. Ricks Water Company v. Elk River Mill & Lumber Company,* 107 Cal. 219, 40 Pac. 486, 48 Am. St. Rep. 121. * *. * The dominion of the state for the purposes of protecting its sovereign rights in the fish within its waters and their preservation for the common enjoyment of its citizens is not confined within the narrow limits suggested by the defendant's argument. It is not restricted to their protection only when found within what may in strictness be held to be navigable or otherwise public waters. It extends to all waters within the state, public or private, wherein these animals are habited or accustomed to resort for spawning or other purposes, and through which they have freedom of passage to and from the public fishing grounds of the state. * * * While the right of fishery upon his own land is exclusively in the riparian proprietor, this does not imply or carry the right to destroy what he does not take. He does not own the fish in the stream. His right of property attaches only to those he reduces to actual possession, and he cannot lawfully kill or obstruct the free passage of those not taken. * * * The fact that acts of the character alleged are by the Penal Code made a misdemeanor, and punishable as such, does not make them less a nuisance, nor imply that the Legislature intended to make the criminal remedy exclusive of the civil. Nor is there anything in the objection that the Attorney General is not privileged to maintain the action upon his own information without the intervention of a private relator.' (*People v. Truckee Lumber Co.,* 116 Cal. 397, 48 Pac. 374, 39 L. R. A. 581, 58 Am. St. Rep. 183.)

"The same doctrine is laid down in *People v. St. Louis,* 10 Ill. 351, 48 Am. Dec. 339; *Commonwealth v. Pittsburg & C. R. Co.,* 24 Pa. 159, 62 Am. Dec. 372; *State ex rel. McCain v. Metschan,* 32 Or. 372, 46 Pac. 791, 53 Pac. 1071, 41 L. R. A. 692."

It is true the foregoing case is not one wherein a monopoly is declared a nuisance, but it is one which recognizes the principle which we regard as controlling in all cases where the question is involved as to whether or not certain things constitute a public nuisance. In that case it was not alleged that any citizen of the state at that particular time by reason of the act of the

defendant was being deprived of natural gas by virtue of the waste in which defendant was indulging, but merely that, by virtue of the waste, they were invading the valuable public right of having that gas conserved, to the end that the people of the state in their communal capacity might not in the future be denied and deprived by virtue of such waste of the right to this common product. This waste, resulting in a diminution in the value of property, the court held interfered with the comfortable enjoyment of life and property of the citizens of the state.

Now let us apply this principle to the facts as averred in the case at bar. The allegations in the petitions before us clearly show that lumber, fuel, and grain, three of the prime necessities of life, are in the community where these combinations are alleged to exist entirely monopolized and under the control of these defendants. The right of the citizens of that community to purchase or sell in an open and free market, shelter, warmth, or grain for food is by virtue of these combinations entirely denied by these defendants. This great and invaluable public right is not only invaded, but absolutely destroyed. The extent of the evil in the present case may be gathered when we consider that from lumber are constructed the houses and homes of nearly our entire population. The inclemencies of the season and the requirements of civilization require and compel men to purchase this commodity in order that they may survive. The same elements make it equally necessary to heat these houses and homes, and yet, under the averments of these petitions, if true, two combinations of a small number of individuals have effectually gotten into their hands the power in this community to exact any price from the citizens thereof for these absolute necessities that they may choose, for in truth the citizens have no choice on the question as to whether they shall purchase or not, and if the law can afford them no relief, they have recourse to but two remedies: First, to yield; or, second, to move, and the extent of the detriment which they may thus be wrongfully compelled to bear is measured only by which of these alternatives presents the least burden. In reference to

grain, which constitutes and makes up the greater portion of the food of the people, and of their domestic animals, a similar condition is alleged to exist, except that it is more far reaching in the evil effects. Here a combination, it is alleged, not only fixes the price which the producer who grows grain for a livelihood shall receive for it, limited only by the burden of taking it to another market, but within the same limitation it has arrogated to itself the right of fixing the price which those who require this necessity must pay for it. Under the operation of combinations of this character, competition which usually corrects inequalities in trade relations is stifled, and the people living there with their homes and establishments are by virtue of these circumstances compelled to patronize those who exploit them. Our population is made up of those who produce raw material, and who purchase goods from dealers. They each and all have a right under the laws of the land to a free and equal opportunity to conduct their daily business operations, unhampered by restrictions imposed by unlawful combinations. They have a right to have the current of their business affairs unobstructed and the atmosphere of their daily transactions unpolluted by monopolistic organizations destroying that free and open market to which all are entitled. The benefit of a free and open market, unhampered by secret combinations with the power by virtue of such to arbitrarily fix prices which those who enter it shall receive and shall be required to pay, is one of the most valuable rights which organized government offers a citizen, and it is a right not only of material value to the individual member in his personal capacity, but it is a right which he is entitled to enjoy as a member of the community in which he lives in common with all of his other rights. Any invasion of this right in the manner indicated by these suits is an invasion of a public right, one which all the citizens of a community should be permitted to enjoy by reason of being law-abiding members of such community and loyal citizens of the state.

That combinations such as are here proceeded against are invasions of this public right and of the interests of the public; and

that such acts are so recognized is declared by numerous authorities. *People v. Milk Exchange,* 145 N. Y. 267, 39 N. E. 1062, 27 L. R. A. 437, 45 Am. St. Rep. 609; *People ex rel. v. Chicago Gas Trust Company,* 130 Ill. 268, 22 N. E. 798, 8 L. R. A. 497, 17 Am. St. Rep. 319; *Richardson v. Buhl,* 77 Mich. 632, 43 N. W. 1102, 6 L. R. A. 457; *Nester et al. v. Continental Brewing Company et al.,* 161 Pa. 473, 29 Atl. 102, 24 L. R. A. 247, 41 Am. St. Rep. 894; *Tuscaloosa Ice Manufacturing Company v. Williams,* 127 Ala. 110, 28 South. 669, 50 L. R. A. 175, 85 Am. St. Rep. 125; *Nashville, Chattanooga & St. Louis Railway Company v. McConnell* (C. C.) 82 Fed. 65. This thought is well expressed by Judge Clark of the federal court for the middle district of Tennessee in the case of *Nashville, Chattanooga & St. Louis Railway Company v. McConnell, supra,* wherein he said:

"It needs no extended statement to make it manifest that the right to carry on a business without interference, without fraud, and without obstruction, is one of the most valuable of all rights. Indeed, in the commercial world the right of greatest value is the right to freely carry on a lawful business without unlawful interruption. It is a substantial right, which may be protected by any remedy known to the court as fully as a constitutional or statutory right, and as fully as a right in the ordinary forms of property."

When we consider the terms of our statute, and find that the word "annoy" is by Webster defined as "to disturb or irritate, especially by continued or repeated acts," and that "insecure" means "not secure, not confident of safety or permanence, distrustful, suspicious; apprehensive of danger or loss," we are unable to come to any other conclusion than that the acts of these defendants as charged in the petitions constituted of their doings under our statute a public common nuisance, which annoyed, injured, and endangered the comfort and safety of others, and in many ways rendered at the same time the people residing in that community and neighborhood where they existed insecure in the use of their property.

This holding on our part interferes in no particular whatever with any legitimate operation by the defendants of their different businesses. It simply prevents them from doing the identical things against which they are entitled to and should be protected on the part of others, and which is denounced by the law as a crime. The business which they are conducting and the ·service given by them to the community in which they live are indispensable, and those so engaged and rendering such service should be · protected in every way in all their legitimate operations. Hence the writ issued in this case should in no wise and ·in no particular interfere with these · defendants in conducting their affairs in a lawful manner. Its' extreme scope should go no further than to restrain them from· maintaining ·a monopoly and acting under the contracts charged against them, and on the trial hereof no permanent writ should issue except upon the production on the part of the plaintiff of 'evidence of high and convincing character.

The record before us shows that the Oklahoma Elevators, one of the parties defendant in case No. 2,100, was not a party in the· proceedings in error, that no service was made upon it, nor appearance made herein, and the judgment rendered will not run as against it. With this exception the judgment of the lower court is accordingly reversed, and the cases are remanded to the district court of Kingfisher county, with instructions to require the defendants herein to answer, and to set the same down for such early determination and trial by that court as the public service and convenience will permit.

WILLIAMS, C. J., TURNER and HAYES, JJ., concur; KANE, J., being of counsel and not sitting.