# GRANVILLE-SMITH *v.* GRANVILLE-SMITH.

No. 261.   Argued February 3–4, 1955.—Decided April 11, 1955.

*Abe Fortas* argued the cause for petitioner. With him on the brief were *George H. T. Dudley* and *Milton V. Freeman.*

Mr. Justice Frankfurter delivered the opinion of the Court.

This case concerns § 9 (a) of the divorce law of the Virgin Islands:

"Notwithstanding the provisions of sections 8 and 9 hereof, [1] if the plaintiff is within the district at the time of the filing of the complaint and has been continuously for six weeks immediately prior thereto, this shall be prima facie evidence of domicile, and where the defendant

---

[1] Section 8 deals with annulment and is not here relevant. Section 9 reads as follows: "In an action for the dissolution of the marriage contract or for a legal separation the plaintiff therein must be an inhabitant of the district at the commencement of the action and for six weeks prior thereto, which residence shall be sufficient to give the Court jurisdiction without regard to the place where the marriage was solemnized or the cause of action arose." Bill No. 14, 8th Legislative Assembly of the Virgin Islands of the United States, Sess., 1944.

Section 9 (a) was added by amendment in 1953. Bill No. 55, 17th Legislative Assembly of the Virgin Islands of the United States, 3d Sess., 1953.

has been personally served within the district or enters a general appearance in the action, then the Court shall have jurisdiction of the action and of the parties thereto without further reference to domicile or to the place where the marriage was solemnized or the cause of action arose."

The circumstances of the case and the course of the litigation are briefly stated. Petitioner filed suit for divorce because of "irreconcilable incompatibility"[2] in the District Court of the Virgin Islands on March 16, 1953. The complaint alleged that she had been a "resident and inhabitant" of the Islands for more than six weeks prior to the commencement of the action, that respondent was not a resident of the Islands, and that the couple had no children under 21. Through Virgin Islands counsel—authorized by a power of attorney executed in New York—respondent entered an appearance, waived personal service, denied petitioner's allegations, and filed a "Waiver and Consent" to "hearing of this cause as if by default" and to "such findings of fact and conclusions of law and decree as to the Court may seem just and reasonable."

Solely on the basis of petitioner's testimony that she had resided in the Virgin Islands continuously for 43 days before bringing suit, the Commissioner who heard the case found that she was a resident and inhabitant of the Islands and had been so for more than six weeks prior to the action. Having also found that the claimed ground for divorce was substantiated, he recommended that she be granted a divorce. On petitioner's motion to confirm the Commissioner's recommendation, the District Court inquired of petitioner's counsel whether he had "any more evidence to offer on the question of domicile." Since no further evidence was proffered, the court, relying on its earlier opinion in *Alton* v. *Alton,* 121 F. Supp. 878, dis-

---

[2] Section 7 (8), Bill No. 14, 8th Legislative Assembly of the Virgin Islands of the United States, Sess., 1944.

4

missed the complaint for want of jurisdiction over petitioner.

The Court of Appeals for the Third Circuit, sitting *en banc,* affirmed, 214 F. 2d 820, on the basis of its decision in the *Alton* case, 207 F. 2d 667. In that case, the Court of Appeals, likewise sitting *en banc* and three judges dissenting, held § 9 (a) in violation of "due process" guaranteed by the Fifth Amendment and the Virgin Islands Organic Act. This Court had granted certiorari in the *Alton* case, 347 U. S. 911, but intervening mootness aborted disposition on the merits. 347 U. S. 610. The obvious importance of the issue which brought the *Alton* case here led us to grant certiorari in this case. 348 U. S. 810. In view of the lack of genuine adversary proceedings at any stage in this litigation, the outcome of which could have far-reaching consequences on domestic relations throughout the United States, the Court invited specially qualified counsel "to appear and present oral argument, as *amicus curiae,* in support of the judgment below." 348 U. S. 885.

We need not consider any of the substantive questions passed on below and we intimate nothing about them. For we find that Congress did not give the Virgin Islands Legislative Assembly power to enact a law with the radiations of § 9 (a).

Article IV, § 3 of the Constitution gives the Congress authority to "make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . ." Accordingly, Congress has from time to time established governments in the various territories that have come under federal control. Territorial government in the continental United States was customarily viewed as a transition step to statehood, and statehood in fact resulted. The Spanish-American War opened a new chapter. Beginning with the Treaty of Paris, the United States acquired by conquest, treaty or

purchase outlying territories for which statehood was not contemplated. The position of these territories in our national scheme gave rise to lively political controversy. Answers to some of the constitutional issues that arose were unfolded in a series of decisions best formulated, perhaps, in opinions by Mr. Chief Justice White [3] and Mr. Chief Justice Taft.[4]

A vital distinction was made between "incorporated" and "unincorporated" territories.[5] The first category had the potentialities of statehood like unto continental territories. The United States Constitution, including the Bill of Rights, fully applied to an "incorporated" territory. See, e. g., *Rassmussen* v. *United States,* 197 U. S. 516. The second category described possessions of the United States not thought of as future States. To these only some essentials, withal undefined, of the Constitution extended. See, e. g., *Balzac* v. *Porto Rico,* 258 U. S. 298. The incidence of the differentiation fell in two areas: (a) the right of the individual to trial by jury and similar protections, e. g., *Balzac* v. *Porto Rico, supra;* (b) the right of the Federal Government to tax territorial products on a nonuniform basis, e. g., *Downes* v. *Bidwell,* 182 U. S. 244.

The legislative power of territories has customarily been expressed as extending to "all rightful subjects of

---

[3] Beginning with *Downes* v. *Bidwell,* 182 U. S. 244, 287–344; see Coudert, The Evolution of the Doctrine of Territorial Incorporation, 26 Col. L. Rev. 823.

[4] In *Balzac* v. *Porto Rico,* 258 U. S. 298.

[5] Both were distinguished from States. "A state, except as the Federal Constitution otherwise requires, is supreme and independent. . . . A dependency [here the Philippines] has no government but that of the United States, except in so far as the United States may permit. . . . [O]ver such a dependency the nation possesses the sovereign powers of the general government plus the powers of a local or a state government in all cases where legislation is possible." *Cincinnati Soap Co.* v. *United States,* 301 U. S. 308, 317.

legislation" not inconsistent with the Constitution or laws of the United States.[6] This conventional phrasing was altered to subjects of "local application," or "not locally inapplicable," in the case of unincorporated territories such as pre-Commonwealth Puerto Rico, the Virgin Islands, and Guam.[7]

The questions that have arisen under grants of legislative powers to territories have fallen into three main classes: (1) those in which the sovereign immunity of the territory was in issue, e. g., *Porto Rico* v. *Rosaly y Castillo*, 227 U. S. 270; (2) those in which conflict was claimed with the United States Constitution or laws, e. g., *Puerto Rico* v. *Shell Co.*, 302 U. S. 253; *Territory of Montana* v. *Lee*, 2 Mont. 124; (3) those in which the "rightful" nature of particular territorial legislation was assailed, e. g., *Tiaco* v. *Forbes*, 228 U. S. 549; *People* v. *Daniels*, 6 Utah 288, 22 P. 159. It is the third group that is our immediate concern. In determining the rightfulness of territorial legislation the courts have considered whether a territorial legislature has transcended the familiar bounds of legislation. See, e. g., *Christianson* v. *King County*, 239 U. S. 356. One of the earlier questions regarding the power of territorial legislatures involved the right to pass laws applicable not generally but to specific individuals or portions of a territory. In *Maynard* v. *Hill*, 125 U. S. 190, this Court held that a legislative divorce granted without cause by the Oregon Territorial Legislature to a local homesteader was valid though the wife was not in the Territory and had had no notice. The Court relied on the historic practice of individual legislative divorces.[8] It is

---

[6] *E. g.*, 37 Stat. 514, 48 U. S. C. § 77 (Alaska).

[7] 39 Stat. 964, 48 U. S. C. § 821 (Puerto Rico); 68 Stat. 500, 48 U. S. C. A. § 1574 (a) (Virgin Islands); 64 Stat. 387, 48 U. S. C. § 1423a (Guam).

[8] ". . . the granting of divorces was a rightful subject of legislation according to the prevailing judicial opinion of the country, and the

significant, however, that while the litigation was in progress Congress forbade territories to pass "local" or "special" divorce laws. 24 Stat. 170, now 48 U. S. C. § 1471.

The United States acquired the Virgin Islands by purchase from Denmark in 1917,[9] but it was not until the Organic Act of 1936 that Congress provided a complete government—including a Legislative Assembly. The Organic Act: (1) labeled the Islands an "insular possession" of the United States, 49 Stat. 1807, 48 U. S. C. § 1405a; (2) endowed the Legislative Assembly (consisting of the two pre-existing municipal councils in joint session) with power to enact laws on "all subjects of local application not inconsistent with . . . this title or the laws of the United States made applicable to said islands, but no law shall be enacted which would impair rights existing or arising by virtue of any treaty entered into by the United States, nor shall the lands or other property of nonresidents be taxed higher than the lands or other property of residents," 49 Stat. 1811, 48 U. S. C. § 1405r; (3) enacted a due process clause for the Islands, 49 Stat. 1815, 48 U. S. C. § 1406g; and (4) gave the District Court jurisdiction over "[a]ll cases of divorce," 49 Stat. 1814, 48 U. S. C. § 1406 (4).

The Legislative Assembly was held on a checkrein by a presidentially appointed governor who shared with the

understanding of the profession, at the time the organic act of Oregon was passed by Congress, when either of the parties divorced was at the time a resident within the territorial jurisdiction of the legislature." 125 U. S., at 209.

[9] The local law as it had existed under Danish rule was continued in effect, 39 Stat. 1132, 48 U. S. C. § 1392, subject to change by the two Colonial Councils, the instruments of municipal government for the two districts of the Islands. Presidential approval of any change in this body of law was required. *Ibid.* Each Colonial Council subsequently passed a divorce law, verbally drawn from that of Alaska. *Burch* v. *Burch*, 195 F. 2d 799, 805–806.

President an absolute veto over legislation. Congress had the customary reserved power to annul legislation. 49 Stat. 1810, 48 U. S. C. § 1405o.

By virtue of the 1936 Organic Act, the Legislative Assembly passed the 1944 divorce law making six weeks' "residence" by an "inhabitant" sufficient for divorce jurisdiction.[10] In 1952, the Court of Appeals for the Third Circuit construed "inhabitant" and "residence" to imply "domiciliary" and "domicile." *Burch* v. *Burch*, 195 F. 2d 799. The legislature thereupon provided that six weeks' "physical presence" was adequate as a basis for divorce. The Governor vetoed this amendment.[11] To overcome the veto, § 9 (a) was enacted. Bill No. 55, 17th Legislative Assembly of the Virgin Islands of the United States, 3d Sess., 1953.

Congress passed a revised Organic Act in 1954. Act of July 22, 1954, 68 Stat. 497, 48 U. S. C. A. § 1541 *et seq.* Previous to the legislation, this Court, on June 1, had dismissed *Alton* v. *Alton, supra,* for mootness. Though the judgment below was vacated, the Court of Appeals had expressed its views on the constitutionality of § 9 (a). Certainly no inference favorable to its validity can be drawn from the revised Organic Act.[12]

---

[10] See note 1, *supra.*

[11] His objection was that the amendment made physical presence sufficient in both *ex parte* and contested actions.

[12] For the first time, the legislation explicitly characterized the Virgin Islands an "unincorporated territory."

The Senate Report spoke as follows: "S. 3378 declares the Virgin Islands to be 'an unincorporated territory of the United States of America.' Thus, their legal status would be distinct and wholly different from that of Hawaii and Alaska, which are Incorporated Territories. . . . [S]tatehood has unvaryingly been the destiny of all Incorporated Territories. . . . On the other hand, there is no precedent . . . for statehood for a political, geographic, and economic unit such as the Virgin Islands would become under S. 3378. . . . A still higher degree of self-government and autonomy is, of course, possible within that framework—such as an elective governor when

In giving content to the power to pass legislation having "local application," two considerations at once obtrude. The phrase most liberally interpreted can be no broader than "all rightful subjects of legislation."[13]  Yet in the Organic Acts of the "incorporated" territories, Alaska and Hawaii, there is specific limitation on divorce jurisdiction to cases where the plaintiff has resided in such territory for at least two years.[14]  37 Stat. 514, 48 U. S. C. § 45 (Alaska); 31 Stat. 150, 48 U. S. C. § 519 (Hawaii).  It is hardly reasonable to believe that Congress was less concerned with the scope of divorce jurisdiction in the "unincorporated" possession of the Virgin Islands, so temptingly near the mainland, and that it intended to give them unrestricted freedom in this sensitive field of legislation.  The Virgin Islands divorce law, with the exception of substantive grounds drawn from Danish law, copied that of Alaska.  See Compiled Laws of the Territory of Alaska (1913) §§ 1293–1306; cf. *Terrill* v.

---

the people are ready for it."  S. Rep. No. 1271, 83d Cong., 2d Sess. 8. Congressman Powell, on the other hand, criticized ". . . the unwarranted failure of the bill to provide for any advance whatsoever toward increased self-government."  100 Cong. Rec. 8664.

[13] See note 12, *supra*.  The Senate Report on the 1936 Organic Act gives some idea of the legislative purpose: ". . . the inhabitants of the Virgin Islands . . . are capable of managing their local affairs. Unfortunately, the islands are not yet economically self-supporting. Hence it has been necessary to provide for an amount of Federal control over local affairs commensurate with continuing expenditures of Federal funds to subsidize the local government. . . .  Matters of purely local concern are placed within local legislative power.  The levying of local taxes and the expenditure of local revenue are authorized.  It has not been deemed wise to give the local government power to incur bonded indebtedness so long as local revenue is insufficient to pay the entire cost of local government.  Locally enacted bills may be vetoed by the Governor."  S. Rep. No. 1974, 74th Cong., 2d Sess. 2.

[14] For the history of the Alaskan provision, see 48 Cong. Rec. 5267–5270, 5293, 5297–5298.

*Terrill,* 2 Alaska 475; *Wilson* v. *Wilson,* 10 Alaska 616. Secondly, "local application" obviously implies limitation to subjects having relevant ties within the territory,[15] to laws growing out of the needs of the Islands and governing relations within them. An example is provided by *Puerto Rico* v. *Shell Co., supra,* which involved the validity of a territorial antitrust law. "It requires no argument to demonstrate that a conspiracy in restraint of trade within the borders of Puerto Rico is clearly a local matter, and that it falls within the precise terms of the power granted . . . ." 302 U. S., at 261. And in upholding the power of the Philippine Legislature to deport dangerous aliens, Mr. Justice Holmes, for the Court, observed that "the local government has all civil and judicial power necessary to govern the Islands. . . . It would be strange if a government so remote should be held bound to wait for the action of Congress in a matter that might touch its life unless dealt with at once and on the spot." *Tiaco* v. *Forbes,* 228 U. S., at 557.

In such light the decisive question is: was § 9 (a) concerned with the needs and interests of the local population or was it, as *amicus* pressed upon us, designed for export?[16] For the purpose of regulating divorce of Virgin Islanders, it may be abstractly relevant but practically it

---

[15] Of course a suit for damages brought by a resident of the Virgin Islands for an injury occurring on the mainland, or a suit against a defendant served in the Virgin Islands arising out of a commercial transaction connecting both the Virgin Islands and the mainland, would clearly contain a relevant tie amply affording jurisdiction to the courts of the Virgin Islands.

[16] We are dealing here with the bearing of the statute on consensual divorces. So far as these are concerned § 9 (a) is an entirety, for in its application the first part of the section accomplishes precisely the same thing as the second. Under our system of law a judge is not charged with the role of an adversary party, and as such called upon to assume responsibility for rebutting a statutory presumption.

has no point.[17]   The Virgin Islanders could of course bring themselves within the 1944 law as interpreted in *Burch* v. *Burch*, 195 F. 2d 799.   They would have no difficulty in making the appropriate showing of connection with the forum.   Virgin Islanders seeking divorce are not sojourners, mere transients in the Islands.   Cf. *Berger* v. *Berger*, 210 F. 2d 403 (C. A. 3d Cir.).   It hardly needs proof to read this statute as one designed for people outside the Virgin Islands.   The Virgin Islands Legislative Assembly stated the purpose of § 9 (a) with disarming frankness.[18]

---

[17] Cf. *People* v. *Daniels*, 6 Utah 288, 293, 22 P. 159, 160, ". . . as to the extent to which the legislature may act on a rightful subject, when the limit is not expressly fixed, the court must ascertain the limit and determine whether the law is within it.   To illustrate: . . . Divorce is also a rightful subject of legislation, but a law giving any married person who might apply to the court a right to a divorce without cause would be invalid."

[18] Three members of the Legislative Assembly addressed themselves to the reasons for changing the result of the Court of Appeals in *Burch* v. *Burch*, see p. 8, *supra*.

Mr. Rohlsen spoke with authority as member in charge of the bill: "The divorce business in the Virgin Islands is quite a thriving business.   I understand that this business provides quite an income for the municipalities since it is estimated that over $300,000 a year is spent within the Virgin Islands by persons who have been using the facilities of our divorce law to put their homes in order.   Unfortunately, because of an error in the draft of original law . . . and because of the Governor's attitude . . . it now becomes necessary for us to consider another amendment which is designed to enhance this u-coming [*sic*] business in the islands . . . .   I am not trying to speak for or against the moral ethics of divorce because, as far as I am concerned, those issues were denied when the statute was encted [*sic*] making it possible for people to come here for divorces. . . .   I consider this matter as a means of enhancing the economy of our islands . . . ."

"The people of the Virgin Islands have enjoyed great financial benefits by an influx of people to these islands for the purpose of getting divorced. . . .   I recommend to my colleagues this piece of legislation for their favorable consideration inasmuch as they can

12

It is inadmissible to assume that Congress authorized the Assembly to traffic in easy divorces for citizens of the States as a stimulus to money-making by the Islanders. What Mr. Chief Justice Taft for the Court said in another connection is strikingly applicable here: "All others can see and understand this. How can we properly shut our minds to it?" *Child Labor Tax Case*, 259 U. S. 20, 37. But it sometimes helps to prove, as well as to see, the obvious.[19]

---

see the disadvantage in which the municipalities have been placed by not having the divorce court functioning at the present time." Proceedings and Debates, 17th Legislative Assembly of the Virgin Islands of the United States, 3d Sess., 1953, pp. 46–47, 66–67.

Moving adoption of the earlier version of § 9 (a), which the Governor vetoed but which does not, so far as concerns our problem, differ from § 9 (a), Mr. Richards stated: ". . . personally I do not see why this Assembly should be deliberating so extensively on this amendment. Only about 2% of the divorces heard and the decisions rendered in the District Courts affect the residents of the Virgin Islands. I should conclude that this law was enacted not to facilitate the bona fide residents of the Virgin Islands but in order to provide as it were source of economic asset to the islands by which people are brought to our shores and contribute to the general economic welfare of the islands. . . . I feel proud to see that only a possible of 2 or three resident[s] of the Virgin Islands are involved in divorce cases a year." Proceedings and Debates, 17th Legislative Assembly of the Virgin Islands of the United States, 2d Sess., 1953, p. 10.

Mr. Heywood, in discussing the earlier amendment, observed: "This bill No. 54 before us today appears to be in my opinion, a devise [*sic*] aimed primarily at transients in the islands. . . . I am very well aware of the volume of divorce business being carried on in these islands. . . . I have heard that there is anticipated a half a million dollars-business in this current year which will be distributed among lawyers, hotel bills, taxi cabs and other business ventures in the Community." *Id.*, at p. 8.

[19] The statistics which follow are derived from these sources: United States Bureau of the Census, Statistical Abstract of the United States: 1954, pp. 9, 63, 85, 940, 942; United States Department of Health, Education, and Welfare, Summary of Marriage and Divorce Statis-

In 1950 the Virgin Islands had 26,665 inhabitants in its 133 square miles; for at least 20 years the population had remained relatively static, and the 1952 census estimates indicate a slight decline. In 1940, 34 divorces were granted in the Islands (1.4 per 1,000 population). In 1951 the figure had reached 312 (12.5 per 1,000). This, per capita, represented the second highest figure for any State or Territory of the United States. Moreover, the Virgin Islands far exceeded its leader, Nevada, in ratio of divorces to marriages. Nevada in 1951 had 55.7 divorces per 1,000 population but at the same time had 289.5 marriage licenses per 1,000. Thus while Nevada granted 5 marriage licenses for every divorce, the Virgin Islands was granting 4 divorces for every 3 marriages. Lest this year be considered unrepresentative, we may look to 1950 and 1952, during which the Islands granted 2 for 1 and 7 for 5 divorces over marriages respectively. Only in the Virgin Islands did divorces exceed marriages during any of the years under consideration. The national average in 1940 was 2.0 divorces and 12.1 marriages per 1,000 population. Apart from some wartime fluctuations, the ratios have been quite stable. In 1951 the average was 2.5 divorces and 10.4 marriages. Thus, while the Virgin Islands was somewhat below the national average for marriages in 1951, it was 5 times the national average for divorce.

In 1952 the Virgin Islands hit its peak of divorces. Three hundred and forty-three were granted (14.3 per 1,000) as opposed to only 237 marriages. But the decisions in *Alton* v. *Alton* reduced the divorce figure to 236 in 1953, and only 111 divorces were granted between January and November of 1954.

tics, United States, 1952, pp. 45, 52–53; United States Department of Health, Education, and Welfare, Monthly Vital Statistics Report, Vol. 3, No. 12, Feb. 15, 1955, p. 7; Brief for Petitioner, p. 53.

14

The extraordinary rate of divorce and the disproportion between marriages and divorces raise controlling doubts of the "local" application of § 9 (a), especially in the context of its legislative history. Such doubts are confirmed by further inquiry. The 1950 Census reveals that only 416 widowed or divorced men and 1,105 widowed or divorced women resided in the Islands.[20] Thus the number of divorces in 1951 nearly equalled the total widowed or divorced male population of the Islands. Remarriage can serve only as a partial explanation. Petitioner's brief reveals a second surprising disproportion. Although the two components of the Islands (the Municipality of St. Croix and the Municipality of St. Thomas and St. John) are nearly equal in population, and although in 1940 St. Croix granted 18 divorces and St. Thomas and St. John 16, by 1952 St. Croix had increased only to 33, whereas St. Thomas and St. John had gone up nearly 2,000% to 310.[21] It is not inappropriate to take judicial notice of the considerably greater tourist facilities on the Islands of St. Thomas and St. John.[22]

We have no information as to the duration of residence of divorcees under the questioned law. But we are advised that contest of jurisdiction occurred in only 1% of the 310 cases concluded in St. Thomas and St. John in 1952 and that contest of the merits was no more frequent. A general appearance—which strips the court of its power to inquire further into domicile—but no contest as to any issue, was the practice in most cases. The clear impact of the legislation, even if we disregard the candid explanations of local political, commercial and

---

[20] United States Bureau of the Census, Statistical Abstract of the United States: 1954, p. 939.

[21] Brief for Petitioner, p. 53.

[22] See Virgin Islands Report, Senate Committee on Interior and Insular Affairs, 83d Cong., 2d Sess. 125–127; VIII Virgin Islands Magazine (Special Edition 1954) 7 et seq.; Murray, The Complete Handbook of the Virgin Islands (1951), 12–100.

legal sources [23] and the rapid drop in divorces following the initial decision of unconstitutionality, is to provide a convenient forum for prosperous persons with substantial connections to the mainland, who desire to sever their marital ties while vacationing. The Commissioner in the case at bar did not even ask petitioner where she lived in the Virgin Islands.

The Legislative Assembly is much less liberal toward would-be voters.[24] One-year domicile is required. Fur-

---

[23] The St. Croix Chamber of Commerce Newsletter for Feb. 1, 1954, cited the "change in the divorce situation" as one reason for the tourist slump during the previous season. District Judge Moore, who decided both *Alton* v. *Alton, supra,* and this case, wrote the Senate Committee on Interior and Insular Affairs: ". . . the present court is not unsympathetic to the fact that the failure to grant these divorces has affected the economic status of both lawyers and guesthouse keepers . . . ." Virgin Islands Report, Senate Committee on Interior and Insular Affairs, 83d Cong., 2d Sess. 4, 54.

[24] "(b) For the purpose of this law 'residents of the Virgin Islands' shall be persons who have maintained legal residence in the Virgin Islands for a period of one year next preceding the date of the election, and in the district in which they desire to vote for a period of sixty days next preceding the election. In all cases of doubt as to legal residence, the Board shall request the registrant to submit substantial and satisfactory proof that the said registrant has fulfilled the legal residence requirement. The domicile, which is the registrant's legal residence, shall be determined in accordance with the following rules:

"1) Every person has a domicile.

"2) There can be but one domicile.

"3) Legal residence or domicile is the place where a person habitually resides when not called elsewhere to work or for some other temporary purpose and to which such person returns in season for rest.

"4) Legal domicile or residence may be changed by joinder of act and intent.

"5) A domicile cannot be lost until a new one has been acquired.

"This subsection shall be strictly enforced by the Board." Bill No. 86, 18th Legislative Assembly of the Virgin Islands of the United States, 2d Sess., 1954, c. II, § 1.

ther, a personal property or income tax on persons physically present for six weeks but with no stronger link to the Islands would no doubt be strongly challenged and of questionable validity.

In the circumstances, we cannot conclude that if Congress had consciously been asked to give the Virgin Islands Legislative Assembly power to do what no State has ever attempted, it would have done so.

*Affirmed.*

MR. JUSTICE HARLAN took no part in the consideration or decision of this case.

MR. JUSTICE CLARK, with whom MR. JUSTICE BLACK and MR. JUSTICE REED join, dissenting.

A "fundamental tenet of judicial review," the late Mr. Justice Jackson said, is that "not the wisdom or policy of legislation, but only the power of the legislature, is a fit subject for consideration by the courts." Jackson, The Struggle for Judicial Supremacy (1941), p. 81. Some 10 years later in *Harisiades* v. *Shaughnessy,* 342 U. S. 580, 590, he added that "judicially we must tolerate what personally we may regard as a legislative mistake."

I must dissent here because I feel that the majority, in striking down the Virgin Islands' divorce law, is substituting its wisdom and policy for that of the Congress. I fail to see how the Virgin Islands' failure to require—in form as well as substance—jurisdictional requirements for divorce equal to those presently in vogue in the States is any more than a "legislative mistake." The Court, however, in the face of an unbroken national history of granting to our territories full authority in legislating on such subjects, declares the Islands' divorce law invalid on the ground that, rather than being "of local

application," [1] it was "designed for export." In so doing, the Court does violence to the command of the Congress; it overrides a long line of its own decisions, as well as the unanimous opinion in this case of the seven judges of the Court of Appeals for the Third Circuit, each of whom has had long experience with territorial acts; and, finally, it confounds the fundamental law governing our territories which heretofore has gone unquestioned.

*What is the Legislative History?*

The legislative history of the "subjects of local application" provision, on which the Court grounds its action, shows beyond a doubt that today's construction was never dreamed of by the Congress.

The Congress first used closely similar language in 1850. The Organic Act for the Territory of New Mexico provided that "the Constitution, and all laws of the United States which are *not locally inapplicable*, shall have the same force and effect within the said Territory of New Mexico as elsewhere within the United States." (Emphasis supplied.) 9 Stat. 452. The Act also declared that the legislative power of the Territory covered "all rightful subjects of legislation, consistent with the Constitution of the United States and the provisions of this act." 9 Stat. 449.

Fifty years later, the Foraker Act, 31 Stat. 77, establishing a civil government for Puerto Rico, used the same "not locally inapplicable" provision when extending the laws of the United States to that Island. With reference to the powers of the local legislature, the Act repeated this phrasing, extending the local authority to "all matters

---

[1] The words of the Organic Act, however, appear to require that local laws merely be on "*subjects* of local application." Divorce, it seems to me, is such a subject.

of a legislative character not locally inapplicable . . . ," [2] 31 Stat. 83, instead of "rightful subjects of legislation." After the Foraker Act, the words evolved but little, until now, with the dropping of the double negative, the phrase has become "subjects of local application."

The majority does not dispute that the legislative power of the Virgin Islands is at least on a par with that of Puerto Rico under the Foraker Act. It does, however, contend that the phrase "of local application" represents a positive limitation on the powers of the Islands below that of a State. That the Virgin Islands has not the quantum of self-government which a State possesses is beyond question. All local laws are subject to the absolute veto shared by the appointive governor and the President of the United States. There are specific limitations on the Islands' legislative power.[3] And Con-

---

[2] Rather than interpreting this as a greater restriction, it would seem more reasonable to me to assume that the Congress, in repeating these words, meant that the legislature, within the specific limitations laid down in the Organic Act, was to exercise the same type of power as Congress could for the Territory, subject, of course, to the power of the Congress. This view is supported by the Government's argument in *Puerto Rico* v. *Shell Co.*, 302 U. S. 253, cited by the majority: "The broad grant to a territorial legislature of 'all local legislative power' in the Territory, to 'extend to all matters of a legislative character not locally inapplicable', in language such as, or similar to, that used in the Organic Act for Puerto Rico, taken in connection with the other provisions of an organic act establishing, as in Puerto Rico, an organized territorial government in accordance with the American system, with legislative, executive and judicial powers, *confers* (with the exceptions specifically stated in the Organic Act) *as plenary local legislative power upon the territorial legislature as that habitually exercised by the legislature of a State.*" (Emphasis supplied.) Government brief, p. 31.

[3] These include the substance of the Bill of Rights, 48 U. S. C. § 1561, and provisions covering the pay of legislators, 48 U. S. C. § 1572, the extent of the franchise, 48 U. S. C. § 1542, and various aspects of legislative procedure, 48 U. S. C. § 1575.

gress has specifically provided that it may annul any local law. 48 U. S. C. § 1574 (c). However, the Islands' divorce law has been neither vetoed nor annulled.

As the majority points out, "the phrase [of local application] most liberally interpreted can be no broader than 'all rightful subjects of legislation.'" Illiberally interpreted, however, it can be no narrower. The Senate Report on the Foraker bill could not possibly be clearer in saying, with reference to the "not locally inapplicable" phrase, that the "legislative assembly . . . shall have complete power, subject to the veto of the governor and the supervision of Congress, to legislate upon *all rightful subjects of legislation.*" (Emphasis supplied.) S. Rep. No. 249, 56th Cong., 1st Sess. 3.

What then, has this Court said, is the meaning of "rightful subjects of legislation"? We note that the majority cites *People* v. *Daniels,* 6 Utah 288, 22 P. 159, a decision by the territorial court of Utah, that the Territory was "restricted" to "rightful subjects of legislation." In *Cope* v. *Cope,* 137 U. S. 682, 684, decided the following year, this Court held "With the exceptions noted in this section [such as 'no law shall be passed interfering with the primary disposition of the soil'], the power of the Territorial legislature was apparently as plenary as that of the legislature of a State." [4]

Nor were the Caribbean territories placed on a footing different from that of our other possessions. The debates

---

[4] See also *Walker* v. *Southern Pacific R. Co.,* 165 U. S. 593, 604 (1897) (New Mexico); *Clinton* v. *Englebrecht,* 13 Wall. 434, 441 (1872) (Utah); *Hornbuckle* v. *Toombs,* 18 Wall. 648, 655 (1874) (Montana); *Gromer* v. *Standard Dredging Co.,* 224 U. S. 362, 370 (1912) (Puerto Rico); *Christianson* v. *King County,* 239 U. S. 356, 365 (1915) (Washington); *Maynard* v. *Hill,* 125 U. S. 190, 204 (1888) (Oregon); *Tiaco* v. *Forbes,* 228 U. S. 549 (Philippine Islands); *In re Murphy,* 5 Wyo. 297, 310, 40 P. 398, 402 (1895) (Wyoming); *Territory* v. *Long Bell Lumber Co.,* 22 Okla. 890, 898, 99 P. 911, 914–915 (1908) (Oklahoma); 19 Op. Atty. Gen. 335, 338 (Arizona).

20

show that Congress was not unaware of the nature of the power it was granting to the local legislators in our Caribbean possessions. Rather than asserting that Puerto Rico had been given less power, one Congressman complained that it had been given more power than had been granted to any territory. 54 Cong. Rec. 3008–3009. Likewise, the debates on the Foraker Act and its successors indicate that the Congress thought that our Caribbean possessions had, within specific restrictions, attained self-government, 54 Cong. Rec. 3074; 53 Cong. Rec. 7478. In one of the debates, at 33 Cong. Rec. 3079, one Senator said, "Congress, having supreme legislative power over the Territories and not being expressly restricted by the Constitution, can delegate power to local tribunals for self-government, corresponding with the powers of the States of the Union as to legislation . . . . Congress has chosen to leave Puerto Rico [and Hawaii] under the control of their local laws." In the debates somewhat earlier, the view was expressed that there was no "radical difference" between Puerto Rico and the other territories, 33 Cong. Rec. 3084, and that Puerto Rico was to receive local self-government, 53 Cong. Rec. 8470. The debates provide further evidence that the phrase "of local application," like its ancestral provisions, was not meant as a limitation on the powers of the territories. Again and again in these debates and committee reports, limitations on self-government for the territories are listed. An examination of these listings shows them to be quite complete, but nowhere does the phrase "of local application" or its equivalent appear among them. 53 Cong. Rec. 7479; H. R. Rep. No. 163, 62d Cong., 1st Sess., p. 2 (with reference to Alaska). In fact, nowhere in the hundreds of pages of legislative history of the acts of Congress using this phrase does it appear that Congress ever contemplated that "of

local application" might be interpreted as a specific limitation.

The government of our Caribbean possessions has been modified by Congress on various occasions, always definitely in the direction of more self-government. See H. R. Rep. No. 461, 63d Cong., 2d Sess.; 53 Cong. Rec. 7469. As is common in such enactments, a compromise is reached between those who want still greater independence and those who feel that the present degree of restriction is warranted. Yet, after exhaustive research, we have found nowhere in the debates or hearings, or in the arguments of those supporting complete self-government for the Islands, even a hint that the phrase "of local application" represents any type of a restriction upon the local government, above and beyond our usual concepts of legislative jurisdiction.

In light of this study, it is difficult for me to follow the reasoning of the majority opinion. Apparently, the Court says a statute is not of local application if it is intended to reach beyond its borders, and, since the Islands' law attracts domiciliaries of other States to the Islands specifically to get divorces, it is *ipso facto* not "of local application." Under this reasoning, other laws would not be "of local application." Five States have divorce laws that certainly attract out-of-staters. Puerto Rico has established "operation bootstrap," a planned campaign to attract industry to the Island by means of tax benefits and several of the States have similar programs. Probably most clearly analogous to the Virgin Islands divorce law is the corporation law of the State of Delaware, which often attracts enterprises doing no business in that State; except for incorporation there may be no contact between these companies and their "home" State. In view of our relatively abstruse constitutional standards of legislative jurisdiction under the Due Process Clause,

see *Miller Bros. Co.* v. *Maryland,* 347 U. S. 340, it strikes me as completely unreasonable to assume that "of local application," without the faintest indication of such in the legislative history, was meant to delegate to the Court a novel standard, equally indefinite, which it might apply on an *ad hoc* basis.

The slenderness of the reed on which the majority depends is further emphasized by the fact that in the 55 years that the "of local application" provision has been used in describing the power of territorial legislatures it has not, so far as I can find, ever been contended in any court, in any judicial opinion, or in any law review or treatise, that the phrase represented any such limitation as the majority has placed upon it.

## What Weight Statistics?

I assume the majority agrees that the Islands' legislature has the power to pass laws on the subject of divorce. In studying this problem, however, it seems to be impressed by the fact that the effect of this law upon the tourist trade (though I assume this too is a local enterprise) was considered of great importance. I had always thought that the courts were not to concern themselves with the motives of the legislature in exercising its powers.

The majority admits that the State of Nevada hands out *each year* forty times as many divorces per capita as the Virgin Islands.[5] The opinion concludes, however, that the Islands are really extending their borders further than Nevada attempts, because their ratio of marriages to divorces is much lower. This approaches the perfect *non sequitur.* The statistics have no relevance whatever to the question before us. I feel, however, that I should point out some of the reasons for the higher ratio

---

[5] Nevada's yearly average is about 9,000; the Islands' highest total is 343, and its 5-year average is about 200.

of marriages to divorces in Nevada. First, the Nevada divorce machinery has become so smooth that the husband-to-be often flies out to be present at the divorce, gets married in the church next door, and then accompanies his new wife to their "new" domicile. Secondly, Nevada does a thriving business not only in divorcing out-of-staters but in marrying them as well; by requiring no waiting period before marriage, Nevada steals a march on nearby California and other States which attempt to force their often impatient residents to wait three days.[6]

## What Law Would Be "Of Local Application"?

The majority's holding that the Islands' law is not "of local application" can be appreciated more fully by asking the question, "What type of a divorce law would be of local application?" The majority does not pass on this, but its whole reasoning is founded on the proposition that only domicile will suffice. The law is not of local application because, "For the purpose of regulating divorce of Virgin Islanders, it may be abstractly relevant but practically it has no point." Pp. 10–11. Why? Because, says the majority, "Virgin Islanders seeking divorce are not sojourners, mere transients in the Islands." They are domiciled in the Islands and could of course bring themselves within the 1944 law as interpreted in *Burch* v. *Burch,* 195 F. 2d 799, 805. They would have no difficulty in making the "appropriate showing of connection with the forum." It is crystal clear that any divorce law *not* requiring domicile will also "be abstractly relevant but practically [will have] no point." In fact, by definition,

---

[6] This arrangement has taken so many nuptials to Nevada that the marriage trade has also become a very lucrative business. So good, in fact, that Nevada's legislature has recently found it necessary to settle a squabble between local officials as to who might perform the marriage ceremony. See Reno Evening Gazette, March 21, 1955, p. 11, col. 3; March 23, p. 11, col. 6.

the only people in the Islands who are not mere "sojourners" or "transients" are those domiciled there. Thus the "appropriate showing of connection with the forum" required before the law can be of other than local application is nothing other than the sacred cow of domicile. Is it any more meaningful to ask whether Congress specifically required the Islands to adhere to domicile as a basis for divorce jurisdiction, come what may, than to ask whether "Congress authorized the Assembly to traffic in easy divorces for citizens of the States as a stimulus to money-making by the Islanders"? Congress authorized the Islands in this area to have the power of a State and thought no more about it. If the majority is willing to say that a State is restrained by the Constitution from passing such enactments, that is another story. But it has not done so. The language of Mr. Justice Brown in *Cope* v. *Cope, supra,* at 685, is peculiarly appropriate here: "[W]hile it is the duty of the courts to put a construction upon statutes, which shall, so far as possible, be consonant with good morals, we know of no legal principle which would authorize us to pronounce a statute of this kind, which is plain and unambiguous upon its face, void, by reason of its failure to conform to our own standard of social and moral obligations. Legislatures are as competent as courts to deal with these subjects, and, in fixing a standard of their own, are beyond our control."

### *What Weight Hawaii and Alaska?*

To rationalize its Procrustean treatment of the Virgin Islands Organic Act, the majority argues that, since Congress has specifically limited the divorce jurisdiction of Alaska and Hawaii to cases where the plaintiff has resided in the Territory for at least two years, it follows that the Congress must have intended similarly to limit the Islands "so temptingly near the mainland." This is but another *non sequitur*. Since 1921 the residence require-

ment in the Islands has never been longer than six months; the 1936 Organic Act in effect recognized and continued that requirement; three years thereafter, in 1939, the residence period was reduced to six weeks; and, in the 1944 law, this new requirement was continued. Then, 10 years later, long after the "extraordinary rate of divorce" had occurred and the controversy over the Islands' law was brought to the attention of the Congress, it adopted, in 1954, a new Organic Act which re-enacted the identical "subjects of local application" provision of the 1936 Act. Cf. *Alaska Steamship Co.* v. *United States*, 290 U. S. 256.[7]

Moreover, the conclusion of the Court that the two-year limitation placed on Alaska and Hawaii casts its shadow on the Islands is "hardly reasonable." If anything, it would be the more logical to assume the opposite—that the Congress, having placed a specific requirement in the Alaskan and Hawaiian Acts and not in the subsequently passed Act for the Islands, had granted the Islands divorce jurisdiction without any such limitation. It is interesting to note the explanation

---

[7] In addition to all this, I believe the re-enactment by Congress of this provision in 1954 is entitled to extra weight. When the Organic Act came up before Congress, the Third Circuit had construed it to permit the Virgin Islands' divorce law. Nor does the fact that the majority in the Third Circuit held the Virgin Islands' law invalid on other grounds change the weight to be given to the re-enactment. Any lawyer would know that, on the constitutional grounds relied on by the one-judge majority, the Supreme Court was just as likely to disagree as to agree. In the not improbable case that the Court held the Virgin Islands' enactment constitutional, a small change in the Organic Act would be the only way of preventing the operation of this Insular "Pied Piper." Yet Congress made no such change. As Chief Justice Stone said dissenting in *Girouard* v. *United States*, 328 U. S. 61, 75, 76, "in any case it is not lightly to be implied that Congress . . . has delegated to this Court the responsibility of giving new content to language deliberately readopted."

of Government counsel on this point in *Porto Rico* v. *Rosaly y Castillo, supra:*

> "That no provision similar to the one here under discussion is contained in the organic act of Hawaii, passed at the same session [of the Congress] is wholly without significance, when due regard is given to the actual conditions of Congressional draftsmanship. The two acts issued from two different committees, and were actually drawn by different sets of legislators. Instances, such as this case discloses, of the lack of uniformity in similar enactments and general want of scientific draftsmanship, are bound to present themselves . . . ." Page 8, Government Brief.

### What Weight Constitutional Doubts?

While the Court's opinion makes no reference to any constitutional doubts, these may have motivated it in striking down the Islands' law on the statutory ground. In my opinion this may be an explanation but it is not an excuse. There are limits to which the Court should not run to escape a constitutional adjudication. Admittedly, the doubt that domicile is not a constitutional requirement is not free from doubters. Even though judge-made, it does involve a peculiarly sensitive area of American life. Nevertheless, the Virgin Islands are entitled to a forthright adjudication on their statute—not one by a phantom escape clause.

The constitutional questions presented on brief and at argument involve the Due Process Clause of the Fifth Amendment, the Full Faith and Credit Clause, and the Tenth Amendment. First of all, neither of the Granville-Smiths claims to have been deprived of life, liberty, or property without due process of law. While the State has an interest in the marital relationship, certainly this

interest does not come within the protection of the Due Process Clause. Likewise, full faith and credit is not applicable. Mrs. Granville-Smith is not asking that this Court make her divorce, if granted, valid in the States. That issue is not here and may never be. All she asks is that the Islands be permitted to proceed under their own law. In this connection, I find no words in the Constitution which require a Territory to give full faith and credit to the laws of a State.

Nor have the Islands invaded the sphere of activities reserved to the States, contrary to the Tenth Amendment. The "Tenth Amendment 'does not operate as a limitation upon the powers, express or implied, delegated to the national government.'" *Case* v. *Bowles,* 327 U. S. 92, 102. The Congress has the power to deal with the Islands, granting or withholding from them the powers of a State as it sees fit.

The only constitutional bugaboo is a judge-made one, domicile.[8] It creates strange anomalies. A married couple, both of whom desire a divorce, can obtain one in Nevada merely by having one spouse "reside" there uninterruptedly for six weeks, and claim an intention to take up permanent residence there. See, *e. g.,* Business Week, July 14, 1945, p. 24. Then, after divorce, though the divorcee immediately leaves Nevada, as was always intended, both sides here concede that regardless of how evident it is there was no domicile in the divorcing State, no other State can question the validity of the divorce so long as both parties appeared in the action. See *Johnson* v. *Muelberger,* 340 U. S. 581. We too agree with the language of Mr. Chief Justice Taft: "All others can see and understand this. How can we properly shut our

---

[8] Even this is being fast undone and "English courts may now grant divorces in many cases where the parties are not domiciled in England." See 65 Harv. L. Rev. 193, 200. See also *Crownover* v. *Crownover,* 58 N. M. 597, 274 P. 2d 127 (1954).

minds to it?"  *Child Labor Tax Case,* 259 U. S. 20, 37.[9] Still the Court strikes down the Islands' law which avoids this judicial fraud.

Divorce is an intensely practical matter, and if a husband and wife domiciled in any State want a divorce enough, we all know that they can secure it in several of our States.  This being true, I see no sense in striking down the Islands' law.  There is no virtue in a state of the law the only practical effect of which would be to make New Yorkers fly 2,400 miles over land to Reno instead of 1,450 miles over water to the Virgin Islands.

The only vice of the Virgin Islands' statute, in an uncontested case like this, is that it makes unnecessary a choice between bigamy and perjury.  I think the Court should not discourage this and I would reverse.

---

[9] An article on the Nevada divorce in a popular magazine shows that the people have not closed their minds even if this Court has. "Nevada's first requirement for a divorce is what lawyers smugly refer to as a 'legal fiction': six weeks' steady residence in Nevada . . . . After this a mild sort of perjury is committed when the applicant mumbles, in reply to the judge's mumble, that she does intend to continue residence in Nevada."  Holiday, February 1949, p. 98.